1

Barry James Christensen II, Pro Se Plaintiff

2

1606 Ashbury Lane, Reno, Nevada 89523

3

702-497-6186

4

LVBJC@mail.com

5

6

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

8

9

BARRY JAMES CHRISTENSEN II,

10

          Plaintiff,

11

vs.

12

FINDLAY ARN, LLC d/b/a AUDI RENO

13

TAHOE, FINDLAY AUTOMOTIVE INC.

14

AND JUSTIN FINDLAY

15

16

        Defendants

17

Case No.:

3:24-cv-00371

COMPLAINT

DEMAND FOR JURY TRIAL

Yes ☒    No

18

19

## JURISDICTION AND VENUE

20

1.  This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331,

21

because this case arises under the Constitution and laws of the United States of America and 28

22

U.S.C. § 1367 because the claims based on state law are so related to the federal question as to

23

form part of the same case or controversy.  This Court also has jurisdiction to grant both

24

declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

25

26

27

28

PAGE 1 OF 71

2. Venue is proper in this Court under 28 U.S.C. § 1391(a), because all the defendants reside in the State of Nevada, and under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action arose in this district.

**PARTIES**

1. Plaintiff

Name: Barry James Christensen II

Address: 1606 Ashbury Lane, Reno, Washoe County, NV 89523

Telephone: 702-497-6186


2. Defendants

Defendant 1:

Name: Findlay ARN, LLC.

Address: 9190 S. Virginia Street, Reno, Washoe County, NV 89511

Telephone: 775-335-1335


Defendant 2:

Name: Findlay Automotive Incorporated

Address: 310 N. Gibson Road, Henderson, Clark County, NV 89014

Telephone: 702-558-8888


Defendant 3:

Name: Justin Findlay

Address: Clark County, Nevada



Telephone: 702-558-8888

## STATEMENT OF MATERIAL FACTS

6. Plaintiff, BARRY JAMES CHRISTENSEN II, (hereinafter "Plaintiff") is an individual who is currently, and was at all relevant times herein, a resident of the State of Nevada, County of Washoe, City of Reno.

7. Defendant, FINDLAY ARN LLC (doing business as Audi Reno Tahoe and hereinafter "Defendant Audi") is a domestic limited liability company organized and existing by virtue of the laws of the State of Nevada.

8. Defendant, FINDLAY AUTOMOTIVE INC. (hereinafter "Defendant Findlay Automotive") is a corporation organized and existing by virtue of the laws of the State of Nevada.

9. Defendant, JUSTIN FINDLAY (hereinafter "Defendant Justin") is an individual who is currently, and was at all relevant times herein, a resident of the State of Nevada.

10. Defendant Findlay Automotive is a substantially involved owner of Audi Reno Tahoe and financially profited from Plaintiff's work performance.

11. Defendant Justin is a substantially involved owner of Audi Reno Tahoe and a substantially involved owner and Vice President of Operations of Defendant Findlay Automotive.

12. Defendant Justin financially profited from Plaintiff's work performance.

13. Defendant Findlay Automotive and Defendant Justin will herein be referred to as "Defendants Findlays."

14.   Defendant Findlay Automotive is an automobile sales group that owns, manages and oversees the operations of more than 30 automobile dealerships in five states, including the State of Nevada.

15.   Defendant Audi is a non-manufacturing, retail automobile sales establishment that began operations in Reno, County of Washoe, Nevada, in January 2012.

16.   Plaintiff and Defendant Audi entered into an arbitration agreement (Exhibit 1, p. 2) in January 2024 as a condition of Plaintiff's continued employment relationship.

17.   The arbitration agreement stated:

> "I also understand that the Dealership utilizes a system of alternative dispute resolution which involves binding arbitration to resolve all disputes that may arise out of the employment context… Both the Dealership and I give up our rights to a trial by jury of any claim that the Dealership or I may have against each other" (Employee Handbook, January 2024, pp. 59-60).

18.   Per page 6 of the Employee Handbook (Exhibit 2, p. 5), the "Dealership" was designated as Audi Reno Tahoe.

19.   There is no other reference indicating a different meaning of the word "Dealership" throughout the 60 page handbook.

20.   The controversy of this complaint is not subject to an agreement to arbitrate because it presents unusual circumstances that constitute good cause for the removal from the program (NRS 38.55 (3)(l)).

21.   The new automobile sales industry is a unique retail sales industry in that it can, and often does, sell vehicles for a negative front gross profit.

22.   The General Sales Manager (Plaintiff's position) is a unique management position within a new automobile sales dealership in that the sales department sells goods for a negative front gross profit and earns manufacturer bonus income.

23.   The controversy of this complaint is complex, and thus far, there are no prior adjudicated cases involving a new automobile sales dealership and a General Sales Manager's Fair Labor Standard Act (FLSA) exemption status to draw upon as a precedent.

24.   The arbitration agreement was unconscionable at the time it was made (NRS 104.2302).

25.   The arbitration agreement stated the arbitrator's fees and costs will be split equally between the parties, and an arbitrator will be selected from the American Arbitration Association (AAA) (Employee Handbook, January 2024, p. 59).

26.   AAA states the filing fee for a complaint filed by an individual for a single arbitrator dispute is $350.00.

27.   Arbitrator fees may be set by a fee schedule or by the arbitrator and must be submitted in advance of their work done on the case.

28.   An examination of AAA's arbitrators' compensation history concluded that AAA arbitrators charge approximately $300 to $1,150 per hour.

29.   Plaintiff has experienced extreme financial hardship since September 2022 due to the claims of this complaint.

30.   Since Plaintiff's resignation on February 10, 2024, Plaintiff has earned $30,825 as of the date of this complaint, equating to an average of $5,137.50 per month (Exhibit 3, p. 7).

31.   Plaintiff's monthly living expenses are more than $10,500 per month.

32.   At the time of this complaint, Plaintiff had less than $120 combined in his bank accounts with U.S. Bank (Exhibit 4, p. 9).

33.    Defendants' violations of the FLSA, the Family Medical Leave Act (FMLA) and Nevada labor laws caused Plaintiff's inability to financially afford to arbitrate his complaint and has left him unable to financially afford legal counsel.

34.    Defendants were violating federal and state labor laws at the same time they required Plaintiff to sign the arbitration agreement in January 2024 for controversies surrounding such federal and state labor laws.

35.    Defendant Audi is a new vehicle dealer in the State of Nevada (NRS 482.078).

36.    Defendant Audi is located at 9190 S. Virginia Street, Reno, Nevada, 89511, which sells and services new and used Audi automobiles, as well as sells and services non-brand used automobiles.

37.    Defendant Audi does not act independently, and its operating decisions were influenced by Defendants Findlays during Plaintiff's time of employment.

38.    Financial profits earned by Defendant Audi were distributed to Defendants Findlays during Plaintiff's time of employment.

39.    Defendant Audi's Business Office Manager was employed by Defendant Findlay Automotive during Plaintiff's time of employment.

40.    Per the Employee Handbook, Defendant Audi's employees were encouraged to contact Defendant Findlay Automotive in regard to employment concerns.

41.    Compensation policies for all Defendant Audi's employees were created, reviewed and approved by Defendant Audi's General Manager, the Business Office Manager and Defendant Justin.

42.    It is common practice for Defendant Findlay Automotive's dealerships to "pack" vehicles for sale with additional fees that are not related to the cost of the vehicle.

43. Defendant Audi's monthly Dealer's financial statements were prepared and approved by the General Manager and Business Office Manager.

44. Defendants Findlays received and reviewed Defendant Audi's financial statements every month since the dealership began its operations.

45. Defendant Audi had a franchise agreement with Audi of America, the manufacturers and distributors of Audi automobiles in the United States (NRS 482.043).

46. Audi of America required all sales staff members employed at their franchised automobile dealerships to complete in-depth training before conducting any sales processes involving new or used Audis.

47. Factory-to-dealer volume incentives were a part of the franchise agreement between Audi of America and Defendant Audi.

48. Factory-to-dealer volume incentives were also referred to as "Margin Bonuses," "Manufacturer Bonuses," and "Audi Money" by Defendants.

49. Per Defendant Audi's Dealer's financial statements, the manufacturer bonus income was reported as "Margin Bonuses" under the Total Audi Franchise income on page 2, line 72 of the balance sheet (Exhibit 5, p. 13).

50. Margin Bonuses were added to the dealership's total profit since Defendant Audi began its operations.

51. Defendants referred to the sales department's income as "variable gross."

52. For automobile sales transactions, "front" gross referred to the amount of profit (customer purchase price minus cost of the car) earned from the sale of a car, and "back" gross referred to the amount of income earned from financing the vehicle and selling additional products, such as warranties and protection packages.

53.   Per Defendant Audi's Dealer's financial statements, the total (front and back) sales gross income for new and used vehicles was reported as "Operating Income" under "Audi Franchise New" and "Audi Franchise Used" on page 3, line 2 of the balance sheet (Exhibit 6, p. 16).

54.   The sale of new and used vehicles resulted in negative front gross profits for many of the sales transactions conducted since the dealership began its operations.

55.   Defendant Audi operated with a hierarchy of positions, led and managed by the General Manager, who oversaw the departments within the dealership.

56.   Mr. Brian Parvin and Ms. Randee Anderson were Defendant Audi's General Managers during the time frame relevant to this complaint.

57.   Mr. Parvin was General Manager of Defendant Audi from approximately January 2016 to December 11, 2023.

58.   Ms. Anderson was Business Office Manager of Defendant Audi from approximately January 2012 until January 3, 2024, at which time she was promoted to General Manager.

59.   Mr. Parvin and Ms. Anderson were interviewed by, hired by, supervised by and reported directly to Defendants Findlays.

60.   There were four departments within Defendant Audi – the business office, sales, service, and parts.

61.   All four departments were managed by a department manager.

62.   During the time frame relevant to this complaint, the sales department employed a General Sales Manager (Plaintiff) to lead and manage Sales Managers, a Finance Manager, and sales staff.

63.   Sales staff included Sales Consultants directly responsible for meeting customers and selling new and used vehicles, a receptionist, a porter, a technologist, and a business development center associate.

64.   Of all the in-store sales department employees at Defendant Audi, the General Sales Manager, the Sales Managers, the Finance Manager and the Sales Consultants were classified as exempt employees per the FLSA.

65.   Sales staff members that were not classified as exempt included the receptionist, porter, technologist and business development center associate.

66.   Other Defendant Audi employees classified as exempt included the Service Manager, Parts Manager, Service Advisors, and Parts Consultants.

67.   Defendant Audi stated in the compensation policies of exempt employees:

> "This Compensation Policy (the 'Policy') sets forth the terms and conditions of the compensation you will be paid by Audi Reno Tahoe (the 'Company'). As a commissioned employee, you are an exempt employee. You will not receive a salary or any other compensation except for that set forth below. The Policy does not constitute a contract for employment…".

68.   Plaintiff's employment relationship with Defendant Audi began on April 16, 2012.

69.   Plaintiff was employed with Defendant Audi from April 16, 2012, to April 19, 2013, as a Sales Consultant.

70.   On April 5, 2013, Plaintiff had a stroke while working at the dealership and was taken to the emergency room by the General Manager at the time, Mr. John Coats, and witnessed by Ms. Anderson.

71.   On April 20, 2013, Plaintiff was promoted to Finance Manager and remained in this position until December 31, 2019.

72.  On January 1, 2020, Plaintiff was promoted to General Sales Manager and remained in this position until February 10, 2024, at which time his employment relationship with Defendant Audi ended.

73.  On January 1, 2020, Plaintiff entered into a General Sales Manager compensation policy with Defendant Audi (Exhibit 7, p. 19).

74.  Plaintiff's new compensation policy was created, reviewed and approved by Defendant Justin, Mr. Parvin and Ms. Anderson.

75.  As General Sales Manager, Plaintiff was subjected to mandatory sales and manager meetings, mandatory training, mandatory work hours which exceeded forty hours per week, limited vacation and sick days per Defendant Findlay Automotive's policy, and required to clock in and out of work every day.

76.  Plaintiff was responsible for determining customer purchase prices of new and used vehicles, and he was held responsible for meeting manufacturer sales goals established monthly, quarterly and annually, which determined the number of units that needed to be sold and the "turn rate" (how many days to sell a vehicle) expectations for Defendant Audi to earn manufacturer bonuses and be allocated an increased number of new cars.

77.  The components of Plaintiff's compensation policy included:

    a.  a $1,500 per month salary;

    b.  4% of the combined new and used front and back sales gross amounts to be determined by the Manufacturer's Financial Statement;

    c.  4% of the applicable manufacturer bonuses to be determined by the Manufacturer's Financial Statement;

d.  8% of finance gross to be determined by the Manufacturer's Financial

Statement;

e.  44 balance sheet page and lines numbers to provide reference for the amount

of new vehicles total sales gross, used vehicles total sales gross, manufacturer

bonuses, and finance gross;

f.  1% commission of the total dealership profit to be determined by the

Manufacturer's Financial Statement;

g.  a "Bonus Program" to offer bonus compensation for meeting specific

dealership objectives related to sales; and

h.  a "Payment Schedule" that set a $6,000 draw amount against earned

commissions to be paid on the last day of the month, and a final settlement on

earned commissions to be paid on the 15th day of the following month.

78.  On September 1, 2022, Defendant Audi hired a Used Car Sales Manager (Exhibit 8, p. 22), Mr. Larry Conidaris, which was approved by Defendant Justin, Mr. Parvin and Ms. Anderson.

79.  Plaintiff's approval as the head of the sales department was not obtained for Mr. Conidaris's position as Used Car Sales Manager, his job description, or his compensation policy.

80.  Mr. Conidaris had never worked at an Audi dealership prior to his employment with Audi Reno Tahoe (Exhibit 9, p.30).

81.  Mr. Conidaris's compensation policy included a $10,000 monthly salary and a 120 day performance review.

82.  On September 13, 2022, at a sales meeting at Audi Reno Tahoe with sales staff members and managers, Mr. Parvin stated:

"Last week I got so frustrated.  I get calls from the owner of the store.  Last month was not a very good month in sales…  It's getting to the point at my last GM meeting (with all Defendant Findlay Automotive's General Managers in Las Vegas, Nevada) which was brought up very clearly by the CFO Tyler (Corder, Chief Financial Officer of Defendant Findlay Automotive), who oversees all the Findlay stores, Justin (Findlay), Robby (Findlay, Vice President of Operations, Defendant Findlay Automotive), every GM in that room – you need to pay attention to your stores.  My job is to make sure the sales managers understand what I expect from them.  Larry's (Conidaris) gonna figure out a way to make sure there's a bunch of used cars for you guys to sell.  We are never gonna lose sight on the importance of new cars, that's up to BJ (Plaintiff).  I'm telling you right now, there's changes.  We can't expect to keep doing the same thing.  We have to be open to change and understand that that change we are trying to get.  I have to report to the owner of the store."

83.  Mr. Conidaris then stated:

"If you need more on the trade, if you need another grand, let me know.  If we let them out the door, chances are they might not be back.  If you get a fish on that hook, don't let them off the hook.  You gotta keep fighting.  We need to get more aggressive on buying cars."

84. Mr. Parvin then stated, "Larry (Conidaris) has a lot of work to get processes in place to handle used cars.  I am a GM.  It is my store.  I have to answer to Justin (Findlay)."

85.  Mr. Conidaris then stated, "I'm gonna handle the used cars, maybe I need to go and talk to these customers more.  If you need more money on a trade, let me know, hey I need another thousand bucks to make my deal.  Can we do it?  Sure.  It's all about making car deals."

86.  Mr. Parvin then stated:

"I am the GM of the store BJ (Plaintiff), and if I ask for things to be done, I expect them to be done.  And I promise you if you want to go to anybody or throw names like Justin Findlay out, if I say we're doing something, we're gonna do it.  At the end of the day, if I ask for something to be done, I expect it to be done.  And that's not a normal vocal that comes out of me to you guys.  I'm gonna say it really clearly, I am the GM of this store and if I ask for something to be done, it's gonna be done.  And I promise you that I will have all the support in the world from Findlay Management (Defendant Findlay Automotive).  And I don't need Justin (Findlay) to send out a memo to change a policy in the store.  I've already had this conversation with Justin (Findlay) yesterday.  I talked about everything we're talking about on my phone call with Justin (Findlay).  We have to protect the king of the store and the business.  There are certain things in place,

and we do things certain ways for reasons. The owner and the general manager communicate to each other, and then the general manager communicates to the rest of the staff. When you own a store and you communicate to the GM, you want it this way, he has no choice. He has to do what he's told to do. Then he tells us what to do. I don't care. I'll start all over. I don't care. Service can carry the whole store. I already told Justin (Findlay), if I have to start from scratch, I will. I'll fire everybody. Justin (Findlay) expects this store to make $150,000 to $200,000 every month. We dropped below $100,000 last month, and he's not happy about it. That's a cannonball fired from Justin (Findlay). We're all gonna be in a meeting with Justin (Findlay) sitting right there. I worked with the group (Defendant Findlay Automotive) long enough, and I've been in these meetings (Defendant Findlay Automotive's General Manager meetings in Las Vegas, Nevada). This is the tone I'm getting from the other person on the other end of the line. I get this way because Justin (Findlay) riles me up. I knew when Larry (Conidaris) was coming things were going to change. I told Justin (Findlay) we might even lose money this month. I'm telling you right now, September is probably gonna be a bigger disappointment."

87. On October 7, 2022, at a sales meeting at Audi Reno Tahoe with sales staff members and managers, Mr. Parvin was asked by Mr. Ryan McCabe (a Sales Consultant) about the profitability of new cars sales, and he responded:

"There is a whole other piece to the puzzle that's behind the scene – that is Audi money. So, if it's a $100,000 sticker car, regardless of what your commission shows on your cap sheet, we're picking up another 7% from Audi as long as we're in the money and have done the things Audi has asked us to do - whether we hit our number. That money goes back into the store like a net add-in so it will offset. So the months we were giving cars away, taking $3000 losers, we would bring the Audi money back in and it would just wipe each other out. If you include the Audi money into this equation, then sales is profitable. That's like the investment the Findlay family (Defendant Findlay Automotive) made in the dealership. They would hope that most of that Audi money goes into their pocket. So there's a certain point where sales needs to carry yourselves. We want the Audi money. They want that profit."

88. Mr. Parvin then stated:

"Numbers are numbers. That's what I'm held responsible for for the store. Now it's time to make sure we get sales up to where we're making a profit, and the place to do that that we have control over is used cars. And that's why Larry's (Conidaris) here. Because you need one person to truly run a profitable used car department. It's up to Larry (Conidaris). If you have any question about anything, you want me to deep dive into numbers and show you, I'm more than happy. That's all I do all day every day is look at numbers in little boxes and

have conversations with the owner, Justin (Findlay), probably every other day, asking me about those numbers in the little boxes. We've sold 10-20 used cars a month on average since the store opened, but we need to do 50 or more. We have to do 50 or more. It's not just that we have to, I've been told that we have to by Justin (Findlay) – you need to sell 50 or more used cars. I have no choice. It's my job to get there – with or without you. It's that simple."

89. On October 10, 2022, Plaintiff emailed a letter (Exhibit 10, p. 33) to Defendant Findlay Automotive's Human Resources Director, Ms. Amber Fontaine, after multiple manager and sales meetings with Mr. Parvin and Mr. Conidaris, to seek advice and guidance on how to handle his concerns about the General Manager's and Used Car Sales Manager's conduct, including threats of being fired, demeaning and demoralizing comments about the sales team in front of customers, unclear role expectations, a lack transparency about the sales department's profitability, and more.

90. On October 14, 2022, at a manager meeting with the department managers, Mr. Parvin stated that Defendant Justin wanted to meet Mr. Conidaris, and they both flew to Las Vegas, Nevada, and spent two full days visiting five of Defendant Findlay Automotive's dealerships, where Defendant Justin had an opportunity to meet the new Used Car Sales Manager.

91. Mr. Parvin then stated:

"Me and Larry spent two full days in five different stores. Introduced him to Justin (Findlay) and Tyler (Corder). So going around to all those stores and introducing Larry (Conidaris), it's always been a running joke with me as I am the last store under Justin's (Findlay) regime that's spoken about very loudly about why we don't sell used cars. I have no choice now because everybody just met him. So now I have Tyler Corder, I have Justin Findlay, I have everybody, and I'm gonna make this really clear to the room – Larry's (Conidaris) here, but Larry can't sell 50 used cars. Larry's not selling 50 used cars. Larry's gonna make sure we have the cars to sell 50. You guys, you two (Plaintiff and Chris Lowe, Sales Manager, Audi Reno Tahoe) and that staff need to figure out how to sell 50 used cars. And it takes an attitude. And Justin (Findlay) also expects us to turn 80% of new cars, so our job and what's on our shoulders, we're under a microscope. We are the last Findlay store, and Justin's (Findlay) final word when we walked out

the door is I can't wait to see you guys take this to the next level. He's going to expect a lot from us, and he doesn't want us to just accept mediocrity or blanking (selling zero cars in a day). Justin calls to ask how many cars you got out today, and if it is zero, he will expect you to sit at the desk until you get a car out and go home at midnight. I mean that's typical. Another thing we talked about with Justin (Findlay) is our hours, so starting immediately, I want you guys to stay open until 7 (pm). We are going to extend our hours, and I had to go through with Justin (Findlay) other Audi dealership hours. Always working under a Justin (Findlay) store, used cars were never really, there kind of just a, Justin's (Findlay) focus was sell as many new cars, let's be rock stars with the manufacturers, let's be so good that they want us and we're trying to earn other points. You know they're trying to earn other stores by pleasing the manufacturer that we can turn new cars, and they can grow their business by getting more facilities, right. Used cars were always looked at by Justin (Findlay) as a byproduct and Justin, he'll tell you this, if Justin was sitting in this room right now, and Tyler (Corder) was like, we didn't pay attention, and now it's almost like they want us to be at 3 to 1 or 2 to 1 used. We are the last store that hasn't made a huge improvement, and my excuse, and I told you, I am out of excuses with Justin (Findlay)… I've been placed with the burden, and there are a lot of things I'm obligated with now and this store is under the microscope and if we have the ability to sell 50 cars because Larry (Conidaris), we're up to 44 used cars right now, 44. Larry runs around all day and just concentrates on used cars. Tyler (Corder) and Justin (Findlay) said selling 50 should be no problem. We cannot be okay not selling a car. I can't have a blank day. Blank day doesn't work. Does not work… Pressure, pressure, pressure is coming, coming, coming – from Justin (Findlay) – you need the right people to get this stuff done. You need to do it… I have no choice but to raise intensity."

92. On October 18, 2022, at a sales managers meeting, Plaintiff asked Mr. Parvin what position Mr. Conidaris was going to have with Audi of America now that he is in charge of the used car inventory.

93. Mr. Parvin responded, "Larry doesn't want a position with Audi. Leave him as a 'other employee' or something so he doesn't have to do the training."

94. On October 27, 2022, at a sales meeting with sales staff members, Mr. Parvin announced he was recently diagnosed as a diabetic, stating:

"The last three months, my body finally passed the threshold that I wasn't aware of, and I am in a new status called diabetic. I am a full blown diabetic. My glucose level was at a critical level – 1200. I've also lost about 30 pounds in the past two months. The problem is that I feel fine, but I am a little light-headed.

I'm on some new medication. I still can't go to a primary care doctor for about two months."

95.  Mr. Parvin then stated:

"We are going to have a meeting every day. My role as a GM is to be a coach and holding everybody accountable to a standard that you need to get better every day. You had to play the game where if you hit your number or hit a percentage of your number, you would earn more cars... If we want more cars, we have to sell the cars, but not just sell them, we have to sell them fast... Audi Reno Tahoe is technically a lower volume store. We have to put ourselves in a position to show that we can sell the same amount of cars they send us in the same month. If it's 20, we need to sell all 20 in that month. If it's 30, we need to sell all 30 in that month. And each time we do that, we get an opportunity to get more cars. Be diligent, be quick, push new cars through and move forward... This store has to sell 50 used cars – been given the task from Findlays (Defendants Findlays). I am going to let Larry (Conidaris) run the used car department. I hired Larry to run the used car department, to buy used cars. Larry has ideas and things, and I'm gonna support Larry in everything he does. What's on my shoulders is I have to sell out the new cars every month, and I have to sell 50 used cars every month. You guys better be figuring out how to sell new cars. We have three days left. When Justin (Findlay) calls this month and asks, where you at, I see the numbers, and he's gonna ask why we have so many new cars on the lot... The heat's being turned up on me and on this store. We need to make money. In Justin's (Findlay) mind, you do the things you need to do, you put the pressure on the people, you threaten them with their jobs, you threaten them with this, you threaten them with that, shit happens. Well, it's sales time to get threatened. Our jobs are all on the line. We need to sell cars – used cars, new cars, we need to figure it out. I promise you in 2023, if things don't change real quick then things will change in the sales department. I have no choice. We have to embrace becoming a used car store. What can we do to save a deal, work it, work it, work it, don't let it go away. I will sell a car for a loss because it's gotta go. I've gotta turn the car. The cars gotta go away. I have no choice but to put the heat on. Don't let people, when they say no, do your best to figure out other ways. Don't end it on – there's no option."

96.  On October 31, 2022, at a managers meeting, Mr. Parvin discussed Defendant Justin's new direction for Audi Reno Tahoe stating:

"In order to keep going, we have to begin to embrace used cars. You're not going to be able to sell 15-20-25 new cars and 10 used and us make any money in sales. It's going to turn back around, just look at the grosses. Occasionally we might get a couple big gross deals. Big dealers just want to blow cars out, and as soon as they start to blow cars out, like in Northern California, there goes the gross. Corporate message to big dealers is turn cars, just flip them. When that happens,

that gross that goes into your pocket starts to go down.  There were no grosses in the deals we were doing in 2019, so what was happening was everybody was probably making minimum wage, or making not the amount of money as managers that you wanted to make.  I don't want to get to that point again where we roll around the corner and things continue to decline."

97.   On November 3, 2022, after a Defendant Findlay Automotive's General Managers meeting in Las Vegas, Nevada, Mr. Parvin shared at a sales managers meeting at Audi Reno Tahoe that Defendant Findlay Automotive was:

> "preaching turn rate, sell your cars, sell your cars, just get rid of them… Turn rate has become so important in order to get more new cars allocated.  We as dealers have to give up all our profit to meet turn rates… BJ (Plaintiff), you need to stay focused on new cars, and Larry (Conidaris), you need to stay focused on used cars.  You're the expert.  That's why you're here.  Larry is here to alleviate you (Plaintiff) from doing trades.  If Larry is here, let him do the trade.  Larry knows how to buy used cars right.  You can't make thousands on a trade unless you're doing everything right from step one.  There is a skill that goes along with that process."

98.   On November 21, 2022, Mr. Parvin shared at a sales meeting with sales staff members at Audi Reno Tahoe, "Salespeople and service writers are productive employees. Everyone else in the store is a non-productive employee.  That's the term the Findlay Group (Defendant Findlay Automotive) uses.  Sales managers are nonproductive employees – not generating commissions.  First ones to be fired are nonproductive employees."

99.   Mr. Parvin then stated, "Tyler (Corder) discussed the importance of paying attention to expenses because we're not going to be able to generate the grosses that we are used to generating on the variable (sales) side because of the change in the economy and because of inventory shortages."

100.   Mr. Parvin then stated:

> "Justin (Findlay) or anyone from the group (Defendant Findlay Automotive) looks at pay plans and payroll and questions what we are paying people.  Then we analyze it together.  Pay plans have to be acceptable in the eyes of the group.

Changes don't come to pay plans because I am being mean.  I have to play the game based on what the numbers show on paper."

101.   Mr. Parvin also shared that there was a "big discussion" at the Defendant Findlay Automotive's General Managers meeting in Las Vegas, Nevada, about "packing cars" with additional fees, stating that, "We know there isn't an opportunity for gross, so we pack cars."

102.   Mr. Parvin then stated:

> "When used cars are at 45 days, you have to gut the deal to sell at cost or below cost, or when we sell new cars at invoice or below, I can't keep paying (salespeople) commissions like this.  Figure out a way to build value and not drop our drawers when we are selling cars – every single car is back to invoice.  If the Findlay family (Defendant Findlay Automotive) is not making money on the bottom line, it is really hard to pay all of us money to be on the Findlay family team.  Try to hold onto gross.  All we are trying to do is hold gross cause again, the more gross we can hold, we are just trying to pay you guys (salespeople).  So, understand that's how commission works…  Need you guys to figure out how to sell and hold gross and make money, not only for yourself, but for the store. When other stores in the area have the same new car selling for a better price, how are we as store going to generate gross to pay you guys if we have to start selling cars in a way that we aren't making gross anymore?  The only thing that we have control over is that we have to start selling used cars."

103.   Mr. Parvin explained a discussion he had with Defendant Findlay Automotive at the same General Managers meeting, stating:

> "Why are your grosses are so low?  And again, our grosses are so low because we made a decision to sell cars at MSRP (manufacturer's suggested retail price). We've sold cars for the last 2 ½ years at MSRP for the most part.  We turn every car we get but we don't make gross.  I get tired of fighting the Findlays (Defendant Findlay Automotive).  I need to do what they want me to do.  I need to do things the way Justin (Findlay) wants them done.  I am done being yelled at and defending you guys.  Because I have been for a long time…  The process of selling a car has to be constantly looked at and analyzed.  Because selling a car is selling a car, but there's certain things that, there's ways that we can sell cars that help and benefit all of us in this room."

104.   In February 2023, Plaintiff attended a General Manager meeting in Las Vegas, Nevada, (at the request of Mr. Parvin because he was not available to attend) sponsored by Defendant Findlay Automotive to discuss the financial statements of all their dealerships.

105.   On March 8, 2023, Plaintiff presented financial data from September 2022 to February 2023 (Exhibit 11, p. 39) to Mr. Parvin demonstrating that the average profit per used car sold was decreasing, used car gross per unit was decreasing, the sales department's profit was decreasing, and the total dealership profit was decreasing.  He also presented financial data demonstrating that Mr. Conidaris's used car purchasing choices were directly related to the decreases in total used car gross and average used car gross per unit.

106.   On March 27, 2023, Plaintiff emailed Defendant Justin (Exhibit 12, p. 42) concerns about Mr. Parvin's physical and mental well-being, his erratic and inconsistent behaviors, employee concerns, Mr. Conidaris's work performance, and the current direction of the dealership.

107.   On April 11, 2023, in retaliation for expressing concern about Mr. Conidaris's work performance and the impact it was having on his income to both Ms. Fontaine and Defendant Justin, Plaintiff was given his first disciplinary warning (Exhibit 13, p. 45) by Mr. Parvin and approved by Ms. Anderson for poor work performance, insubordination and failure to comply with company policy.

108.   Mr. Parvin stated during the disciplinary meeting with Plaintiff, "You, being the GSM, have been given the opportunity to be in charge of our entire 'variable' (sales) department as well as our sales team.  This holds you ultimately responsible for the results that are generated by our people in the sales department."

109.   Plaintiff was also told he was not to communicate with or supervise Mr. Conidaris, and the acquisition of a used car inventory was strictly within Mr. Conidaris's control.

110.   On April 13, 2023, Plaintiff responded to Ms. Anderson and Ms. Fontaine in regard to his disciplinary warning (Exhibit 14, p. 48).

111.   Plaintiff's response included an appeal to the claims of poor work performance, insubordination and failure to comply with company policies, as well as sharing his concerns again about Mr. Parvin's and Mr. Conidaris's conduct and work performance.

112.   Plaintiff also shared that his hostile work situation has only worsened in the last six months since originally sharing his concerns in October 2022.

113.   On May 25, 2023, Plaintiff inquired with Defendant Audi and Defendant Findlay Automotive about his protected right to family medical leave due to two of his children having major surgeries on June 7, 2023, and June 9, 2023.

114.   Effective June 1, 2023, and signed on June 6, 2023, a new compensation policy (Exhibit 15, p. 56) was approved and implemented by Mr. Parvin, Ms. Anderson and Defendant Justin that had significant changes to Plaintiff's compensation policy, including the elimination of his $1,500 monthly salary and increased dealership objectives related to sales in order to earn bonus compensation.

115.   On June 6, 2023, Plaintiff was notified by Defendant Audi and Defendant Findlay Automotive that his FMLA job protected unpaid leave coverage was approved to commence on June 7, 2023, with an expectation to return to work on August 8, 2023.

116.   On June 7, 2023, Plaintiff's family medical leave began.

117.   On August 8, 2023, Plaintiff returned to work at Defendant Audi as General Sales Manager.

118.   In September 2023, Plaintiff presented financial data (Exhibit 16, p. 60) from August 2022 to August 2023 to Mr. Parvin, Ms. Anderson and Ms. Fontaine, demonstrating that new car sales net profit was decreasing, used car sales net profit was decreasing, used car sales supervision compensation was increasing, sales selling expenses were increasing, new car

miscellaneous expenses was increasing, used car miscellaneous expenses was increasing, and the dealership's overall net profit was decreasing.

119.   At this same presentation, Plaintiff asked how he could be held financially responsible for the used car losses and increased expenses with no authority over Mr. Conidaris's buying and selling decisions and no authority over the sales department's expenses.

120.   Plaintiff also asked all three managers for help in making positive changes to the sales department.

121.   On September 15, 2023, Mr. Conidaris had a work-related injury that led to a laceration on his head and an unsteady ability to walk, as witnessed by several employees, after he hit his head on a metal garage door.

122.   Plaintiff informed Mr. Parvin and Ms. Anderson of the incident and proceeded to request a drug test (which was provided on the premises and to be performed by an approved manager) from Mr. Conidaris per Defendants Audi and Findlay Automotive's strict alcohol and drug use policies prescribed in their employee handbook to ensure a safe working environment.

123.   Mr. Conidaris refused the drug test, and Mr. Parvin almost immediately removed him from the premises, with neither of them returning to the dealership for the rest of the working day.

124.   On September 25, 2023, after Plaintiff's in-person presentation earlier this month to Mr. Parvin and Ms. Anderson, he sent an email (Exhibit 17, p. 64) to both of them requesting a meeting to discuss the matters brought up at the presentation, and he did not receive a response from either of them; nor did either of them ever schedule a meeting with Plaintiff to go over his concerns.

125.   On October 20, 2023, Mr. Parvin crashed his recreational vehicle into a vehicle that was parked in the dealership's parking lot, and this incident was witnessed by several employees.

126.   When asked by the Service Manager, Eddie Nelson, to submit to a drug test on the premises, Mr. Parvin walked away, got into his car, and drove away from the dealership, not to return to the dealership for the rest of the working day.

127.   On October 24, 2023, Plaintiff inquired with Ms. Fontaine (Exhibit 18, p. 66) as to the consequences Mr. Parvin faced because of Defendants Audi and Findlay Automotive's strict alcohol and drug use policies.

128.   On November 3, 2023, Ms. Fontaine replied that the situation was "being handled" (Exhibit 19, p.69).

129.   On November 3, 2023, Audi of America implemented a Dealer Growth Bonus (Exhibit 20, p. 71) based on new car sales, and Mr. Jim Reynolds, the Audi Area Director, notified Mr. Parvin and Plaintiff about this new retail sales objective bonus.

130.   On November 30, 2023, the sales department met the Audi of America objective and earned the manufacturer bonus for the dealership.

131.   On December 9, 2023, Plaintiff asked Mr. Parvin why his paycheck did not include a percentage of the manufacturer bonus achieved by the sales department for the month of November 2023 (Exhibit 21, p. 73).

132.   After a review of the November 2023 Dealer's financial statement (Exhibit 22, p. 74), Plaintiff determined that the $39,200 manufacturer bonus earned by the sales department was reported as "Other Income" on page 2, line 73, and not included with the Margin Bonuses.

133.   On December 11, 2023, Defendant Audi's employees were notified that Mr. Parvin was no longer General Manager of Audi Reno Tahoe.

134.  On December 19, 2023, Defendant Justin emailed Plaintiff (Exhibit 23, p. 77) stating that he planned to discuss with Plaintiff at his General Manager interview the importance of a plan to become "Sales effective in Audi's eyes" per Audi of America's expectations for the dealership's sales performance, stating that "Dealer will achieve the best sales performance possible in Dealer's Area for each model and type of Authorized Automobile.  The measurement for Dealer's yearly sales performance will be the objective established in the applicable annual Operating Plan."

135.  On December 20, 2023, Defendant Justin and Tyler Corder interviewed several Defendant Audi's employees for the position of General Manager of Audi Reno Tahoe, including Plaintiff.

136.  During Plaintiff's interview for the General Manager position, Defendant Justin and Tyler Corder told Plaintiff about the importance of reaching Audi of America's sales expectations.

137.  On January 3, 2024, Ms. Anderson was promoted from Business Office Manager to General Manager of Audi Reno Tahoe.

138.  Shortly thereafter, Ms. Alysa Burke, was promoted from Ms. Anderson's Business Office Assistant to Business Office Manager of Audi Reno Tahoe.

139.  On January 23, 2024, Ms. Anderson emailed Plaintiff (Exhibit 24, p. 80) stating she is implementing increased work hours for the sales department effective February 1, 2024.

140.  On January 25, 2024, Ms. Anderson emailed Plaintiff (Exhibit 25, p. 82) stating, "Pay plans for you … are not my top priority at the moment.  I did express to you that I don't love how many components they include, and that in a performance based role, a raise comes from increased profitability."

141.   On January 29, 2024, Ms. Anderson stated in an email to Plaintiff (Exhibit 26, p. 84) that the "well-being of our employees" should not be an excuse to argue against enforcing additional work hours upon the sales team.

142.   On January 29, 2024, Ms. Anderson asked Plaintiff in an email (Exhibit 27, p. 86) where he was at in teaching Mr. Conidaris how to desk deals, and she stated they needed to address sales manager discrepancies in appraising trade-ins due to the current used car appraisal system varying so drastically.

143.   On January 30, 2024, at a manager meeting, Ms. Anderson and Ms. Burke requested that the department managers submit more details on credit card and reimbursement receipts in the future as the past practices of the dealership did not include detailed information from the department managers with regard to credit card and reimbursement receipts.

144.   Ms. Anderson stated:

> "I know in the past, I've been really good about emailing you guys or asking you all the questions about what are these things for.  With Marsha taking it over, credit card receipts or reimbursement receipts, write down exactly what those things are for – a description for items or lunches.  With lunch, who did you go with, that becomes important.  Who it is or what the purpose is.  We don't just pay for lunch for funsies.  There should be business discussed at the lunch.  It's on the company's dime, so what did you discuss, make it look nice.  I'm okay with you guys buying lunch on occasion but make sure we're on the up and up because there's a lot of stuff that I think could have fallen in a gray area prior but from a corporate perspective, with your GM being a former business manager, there's no way some of those gray areas are going to fly anymore with the accountability I'm held to."

145.   Ms. Anderson then stated:

> "Everything starts with communication.  It starts with Justin (Findlay) and with Tyler (Corder).  And I got a whole earful of that while I was gone last week.  It starts from me to you guys and from you guys to your employees.  Your job is managing the people, the processes and the money.  I'm going to force your hand to take this to the next step.  There should be reasonable time frames for responses to emails.  I have so much faith in your ability to manage your people.  We need to start running this dealership like a business.  I'm pushing.  Everyone in this

room has seen me push to do something that they don't like or they aren't comfortable with or that is new, and that's happening, and it's not going to stop. I'm hoping I can push and that you guys are going to receive."

146.   Ms. Anderson then stated:

"I have things from the GM meeting (with Defendant Findlay Automotive in Las Vegas, Nevada) I'm dying to discuss with you. You guys have seen the NCM books (Complete Financial Composites of all the Defendant Findlay Automotive's dealerships) more than I have but one thing that came up across the board – it's a hard line in the sand from Chad (Leavitt, Chief Accounting Officer, Defendant Findlay Automotive) and Tyler (Corder)."

147.   Mr. Conidaris stated, "I think we should revisit the service loaners and restrategize how we pull those out because we're just getting killed on those cars."

148.   Ms. Anderson responded, "There's several moving parts and it's not fair that sales is taking the loss on those. You guys should be getting cars at a reasonable price. Sales would not put the number on those cars that they are getting stuck with them for, that's not fair, that's not okay."

149.   Mr. Conidaris responded, "I can't price the A3's low enough to move them."

150.   On February 6, 2024, at a manager meeting, Mr. Conidaris informed Plaintiff that he and Ms. Anderson made the decision to purchase 15 used Audis from auctions in California, and the vehicles would be arriving today.

151.   Mr. Conidaris then stated that all the vehicles will need to be Audi Certified, and Ms. Anderson stated that she believed they were going to be negative in all of them after the inspection fees, repairs costs, and certification fees.

152.   Mr. Conidaris then stated:

"The other thing Randee (Ms. Anderson) and I were talking about is that the greatest source to stock our lot is always going to be buying cars off of customers. Right now, they come in to me and say I need an idea of what this car's worth.

> Now there is more cars available than there were a year ago at the auctions. There was a lot of cars available, and there are decent buys."

153.   Ms. Anderson then stated, "The financial statements are done.  We had $60,000 in extra Audi money, and if it weren't for that, we would have lost money."

154.   Ms. Anderson then stated:

> "Like this, I'm paying you all right now.  We are all getting a paycheck right now to sit here and talk about the same crap.  It's like beating your head against a wall. I want to be done with it.  I want to be focusing on the things that we are making money with, on the things that are fun and happy and exciting and how we grow and how we elevate things, not the same crap that we keep drudging up from the bottom of the pile, it's time to move on… This is the last time I am going to be talking about some very, very basic things.  I'm just gonna start taking action. You are responsible for managing your employees."

155.   On February 10, 2024, with a demand for more hours, increased managerial responsibilities (including teaching Mr. Conidaris and Ms. Anderson sales processes), an unwillingness to address Plaintiff's compensation policy, the constant pressure to meet Audi of America's sales objectives and be profitable in the sales department simultaneously, and a lack of concern for the employees' well-being and Plaintiff's emotional and physical well-being, Plaintiff was forced to resign (Exhibit 28, p. 88) and end his employment relationships with Defendant Audi and Defendant Findlay Automotive.

## CLAIMS

### First Claim

Law Violated: Failure to Provide Overtime Pay (Fair Labor Standards Act, 29 U.S.C. § 207(i)). Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.   Defendant Audi and Defendants Findlays violated FLSA 29 U.S.C. § 207(i) by working together to create and approve Plaintiff's General Sales Manager compensation policy, which did not adhere to the FLSA requirement that more than half of a retail commissioned

employee's total earnings in a representative period must consist of commissions resulting from a bona fide commission rate.

2.   During the course of Plaintiff's employment as General Sales Manager with Defendant Audi, there were three FLSA exemptions available to retail automobile establishments.  These exemptions were the *Automobile Sales and Service Exemption*, the *Administrative Exemption*, and the *Retail Establishment Exemption for Commissioned Employees*.  Defendant Audi did not clarify which exemption applied to Plaintiff's position.  He was only told that he was exempt because he earned commissions.

**Automobile Sales and Service Exemption**

3.   The Automobile Sales and Service Exemption (29 U.S.C. § 213(b)(10)(A)) exempts any salesman primarily engaged in selling or servicing automobiles by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers.  A qualifying employee is one who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the automobiles.  29 CFR § 779.372(c)(1) defines "primarily engaged" as applied to the employee's work to mean that the major part or over 50 percent of the salesperson's time must be spent in selling or servicing enumerated vehicles.  Plaintiff did not sell cars to ultimate purchasers.  Of all vehicles sold by Defendant Audi since Plaintiff's promotion to General Sales Manager (a total of 2,261 new and used vehicles), he was not the commissioned salesperson of record on one of the sales transactions.  Plaintiff primarily engaged in the management and administrative activities of the sales department, and he did not meet the duty requirements to be classified as an exempt automobile salesperson.

**Administrative Exemption**

4.   The Administrative Exemption (29 CFR § 541.200) exempts employees in a bona fide administrative capacity when they are compensated on a salary or fee basis at not less than the level set forth in § 541.600, whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer and the employer's customers, and whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  The salary must be no less than one and one-half times the prevailing minimum wage for that year.  Per NRS 608.250, the minimum wage for employees with health insurance in Nevada was $8.00 per hour in 2020, $8.75 per hour in 2021, $9.50 an hour in 2022, and $10.25 an hour in 2023.  This equates to the 2020 minimum salary requirement needed to claim an Administrative Exemption was equal to $2,080 per month, with the minimum requirement increasing each year.  Plaintiff earned a $1,500 salary from January 1, 2020, to June 1, 2023, at which time, his salary was reduced to $0. Despite meeting the duty requirements for the Administrative Exemption, Plaintiff did not meet the salary requirements to be classified as an exempt administrative employee.

**_Retail Sales Exemption for Commissioned Employees_**

5.   If a retail employer elects to use the 29 U.S.C. § 207(i) overtime exemption for commissioned employees, three conditions must be met:

a.   the employee must be employed by a retail or service establishment, and

b.   the employee's regular rate of pay must exceed one and one-half times the applicable minimum wage for every hour worked in a workweek in which overtime hours are worked, and

c.   more than half the employee's total earnings in a representative period must consist of commissions.

6.   Unless all three conditions are met, the Section 7(i) exemption is not appliable, and overtime premium pay must be paid for all hours worked over 40 in a workweek at times one and one-half the regular rate of pay.  Plaintiff agrees that he was an employee of a retail establishment and his regular rate of pay exceeded one and one-half times the applicable minimum wage, but he does not agree that more than half of his total earnings consisted of commissions.  Defendants violated this federal exemption law by not compensating Plaintiff commissions on goods or services resulting from a bona fide commission rate.

7.   The new automobile sales dealership industry is a unique retail sales establishment in that it can, and often does, sell automobiles for a negative front gross profit (the actual cost of the car exceeds the customer's purchase price).  This differs from most traditional retail establishments (i.e. furniture stores, jewelry stores, electronic stores, etc.), where the majority of their income, if not all, is earned from positive gross profits from the sales of goods or services because customers almost always purchase the goods or services for a price greater than the actual cost.  One of the main reasons new automobile sales dealerships have the ability to sell automobiles for a negative front gross profit is the franchise agreements with auto manufacturers that offer dealerships the ability to earn factory-to-dealer volume incentives as a source of income.  Defendant Audi had such an agreement with Audi of America.

8.   The factory-to-dealer volume incentives earned by Defendant Audi were identified as "Margin Bonuses" on their Dealer financial statements, as "Manufacturer Bonuses" on their compensation policies, and as "Audi Money" by their General Managers, as stated in the facts.

9.   Another reason new automobile sales dealerships have the ability to sell automobiles for negative front gross profits is because the dealership has the ability to earn income from the

sales of cars in other ways, such as through financing (back gross), service repair orders, and parts.

10.    Plaintiff's compensation policy included an equal percentage (4%) of two separate financial components – a combined total of sales gross profit and manufacturer bonuses, but labeling a share of manufacturer bonuses as "commissions" does not meet the required standard established by the U.S. Department of Labor (DOL), the FLSA and Nevada labor laws.  The Nevada Revised Statutes acknowledges the existence of sales incentives from manufacturers for new vehicle dealers in NRS 482.36385(7) and NRS 482.363574 and does not refer to sales incentives as a commission or a part of sales gross profit but as an agreement made between the manufacturer and dealership to earn additional income.  NRS 607.005 defines "commission" as a fee paid for transacting a piece of business or performing a service, but excluding bonuses and profit-sharing arrangements.  The Third and Seventh Circuits and the DOL have applied the idea of "proportionality" to be indicative of bona fide commission rates.  An appellate court explained that to constitute a commission under 29 U.S.C. § 207(i), the employer must establish some proportionality between the compensation to the employees and the amount charged to the customers.  The Third and Seventh Circuits and Congress also stipulated that it is a question of law as to whether or not a commission system offends the purposes of the FLSA, including protecting workers against certain unfair pay practices.

11.    Plaintiff contends that proportionality is not present in his compensation policy because manufacturer bonuses were earned based on the number of units sold, and they were not earned based on the amount charged to the customers.  Dealers purchase vehicles from manufacturers for a set cost, and how much the dealership chooses to sell a vehicle to customers for bears no relevance on the income received from manufacturer bonuses.  The whole premise

behind earning a commission is that the amount of profit earned from a sale would increase income payable to the employee in proportion to the amount of profit, yet this is not the case for the Plaintiff.

12.   Plaintiff also contends the manufacturer bonuses were paid by Audi of America and earned by Defendant Audi, as demonstrated in the facts.  The gross profit from sales was paid by the customers and earned by the sales department.

13.   In addition to the legal clarification regarding a bona fide commission rate, Defendant Audi and Defendant Findlay Automotive distinctly differentiated between sales gross profit and manufacturer bonuses in the Sales Consultant's compensation policy.  Defendant Audi stated in Plaintiff's original compensation policy as a Sales Consultant (Exhibit 29, p. 97) that "Factory-to-dealer volume incentives and factory holdback are not considered part of the gross profit for sales pay plan purposes."  Additionally, the compensation policy defined "Commission Gross Profit" as the amount charged to the customer over the actual factory invoice and/or cost minus:

  a.   Any allowance over the actual trade in value if a trade vehicle is involved;

  b.   Any dealer installed options;

  c.   Any expense related to the acquisition of the vehicle;

  d.   Any customer receivables not collected by the dealership; and

  e.   Any additional costs incurred on sold units for the first ninety (90) days.

14.   Defendant Audi also distinctly differentiated between sales gross profit and manufacturer bonuses in their financial accounting of the income.  Defendant Audi does not financially report manufacturer bonuses as part of the operating income of the sales department. The gross profit of the sales department is generated by the income derived from customers

purchasing new and used cars.  The Audi of America Margin Bonuses are financially reported as income earned by the dealership.  As demonstrated by the facts, Audi Money is a dealership add-in, and Defendants Findlays consider the income from manufacturer bonuses as a return on their investment in the franchise.  Besides the two components of Plaintiff's compensation policy being earned differently and financially reported as income differently, they are conflicting and opposing components.  Plaintiff's responsibility as General Sales Manager was to determine the price customers could purchase new and used vehicles for.  As demonstrated by the facts, Plaintiff was forced to reduce front gross profits from sales to meet manufacturer sales objectives.  The sales department had to sell cars for a negative front gross profit to meet the volume objectives, as well as the turn rate expectations set forth by the manufacturer.  In order to increase the manufacturer bonus income for the dealership, Plaintiff had to decrease the amount of front gross profit earned by sales in many instances.

15.  Based on these facts, Plaintiff's compensation policy does not exhibit all the necessary traits to constitute a bona fide commission rate and did not meet the three requirements to be classified as an exempt employee under the FLSA 29 U.S.C. § 207(i).  Section 7(i) was enacted to relieve an employer from the obligation of paying overtime compensation to certain employees of a retail or service establishment paid wholly or in greater part based on commissions.  An employer cannot simply label a percentage of a compensation component, such as a share of their bonus income, as "commissions" to qualify for the retail sales exemption. Commissions are defined by how they are earned, who they are earned from, and based on what a customer pays for a product and the profit made, such as in Defendant Audi's service and parts departments.  As demonstrated by the accurate compensation policies for all other exempt employees at Defendant Audi and Defendants' understanding of the difference between

manufacturer bonuses and sales gross profit, Defendants had a working knowledge of the FLSA

exemptions policies but willfully chose to misclassify Plaintiff and mislead him by including the

two components on the same line on his compensation policy and labeling them both as a

component of "variable gross."  Ordinary violations of the FLSA are subject to a two-year statute

of limitations; however, willful violations of the FLSA are subject to an extended three-year

statute of limitations and liquidated damages.

16.   The willful misclassification of Plaintiff as an exempt employee and the violation of

FLSA 29 U.S.C. § 207(i) deprived Plaintiff of overtime compensation earned during his

employment as General Sales Manager of Defendant Audi and caused significant financial harm,

emotional harm, and physical harm to Plaintiff.

## Second Claim

Law Violated: Unlawful Decrease in Compensation by Employer (NRS 608.100).

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.   Defendant Audi and Defendants Findlays violated NRS 608.100 by working together

to create and approve Plaintiff's General Sales Manager compensation policy, which was

subjected to unlawful decreases in compensation.

2.   Defendants regularly practiced adding fees to the purchase prices of new and used

cars that were unrelated to the cost of the car.  As stated in the facts, these fees were added

because Defendants expected to sell vehicles for a negative front gross.  These fees were known

as a "PACK" fee ($550 to $800) and a "Doc" fee ($398.50).  Defendant Audi was the recipient

of the income earned by Doc fee charges, and Defendant Findlay Automotive was the recipient

of the income earned by PACK fee charges; therefore, all Defendants financially profited from

the added fees on every vehicle sold regardless of if the sale resulted in a positive or negative front gross.

3.  NRS 608.100(1) § § (b) and (c) states it is unlawful for any employer to pay a lower wage, salary or compensation to an employee than the amount the employer is required to pay the employee by any statute or regulation or by contract between the employer and the employee, or lower than the amount earned by the employee when the work was performed.  Additionally, an employer may deduct any amount from an employee's wages only if such deductions are either made in accordance with the provisions of the law or any rule or regulation issued by any governmental agency or expressly authorized in writing by the employee and are for the benefit of the employee.  Defendant Audi compensated Plaintiff a lower amount of compensation than what was required per his compensation policy and a lower amount of compensation than the amount earned by Plaintiff when his work was performed.

***Compensation Policy Required Compensation***

4.  Per Plaintiff's compensation policy, commissionable compensation was to be paid according to:

> a.  4% of the new and used vehicle sales gross amounts as determined by the Manufacturer's Financial Statement;
>
> b.  4% of the applicable manufacturer bonuses as determined by the Manufacturer's Financial Statement;
>
> c.  Additional 8% of finance gross as determined by the Manufacturer's Financial Statement; and
>
> d.  1% commission of the total dealership profit as determined by the Manufacturer's Financial Statement.

5.   Audi Reno Tahoe is a "Dealer" (NRS 482.020), and Audi of America is a "Manufacturer" (NRS 482.060).

6.   During Plaintiff's time as General Sales Manager from January 1, 2020, to January 31, 2024, his commissions were calculated and compensated as determined by the "Dealer's" financial statement, not the "Manufacturer's" financial statement.  This led to a lower amount of compensation because the Dealer's financial statement reported the sales gross profits after the addition of PACK and Doc fees.  The additions of PACK and Doc fees were not made in accordance with any law or regulation, nor were they expressly authorized by Plaintiff, nor were these fees added for Plaintiff's benefit.

7.   The Vehicle Cost Report is a document produced by Defendant Audi's sales department for every new and used vehicle purchase transaction which disclosed the manufacturer's cost of the vehicle before the addition of PACK fees.  The Dealer Recap Sheet is a document also produced by the sales department for every new and used vehicle purchase transaction which disclosed the addition of a Doc fee as "Other Fees Charged in Deal."  Neither of these additional fees charged to customers are related to the manufacturer's cost of the car, trade in values, dealer installed options, acquisition expenses, uncollected customer receivables, or incurred costs; therefore, these fees are a part of the sales gross profit earned by the sales department for every new and used car sold.

8.   Plaintiff was entitled to 4% commission of the additional fees based on his compensation policy being determined by the sales gross profit reported on the Manufacturer's financial statements.

9.   When calculating Plaintiff's commissions earned, Defendant Audi did not include these fees as part of the sales gross profit; therefore, he was not compensated 4% of the fees.

10. Not only was Plaintiff not compensated commissions for these fees, but he compensated Defendant Audi 4% commission of every additional fee charged in sales transactions.

11. By adding these fees to the price of every car sold, it directly reduced the total sales gross profit by these amounts, which directly reduced Plaintiff's earned commissions because his commissionable income was calculated based on an aggregate total of all sales transactions.

12. To follow is an example of how adding PACK and Doc fees affected Plaintiff's earnings for positive and negative gross profit sales:

| Manufacturer Statement | Dealer Statement |
|---|---|
| Manufacturer Invoice $50,000 | Manufacturer Invoice $50,000 |
| | Add PACK fee of $800 |
| | Add Doc fee of $400 |
| Customer Cost of Car $50,000 | Customer Cost of Car $51,200 |
| Customer Purchase Price $49,000 | Customer Purchase Price $49,000 |
| Dealer Negative Front Gross Profit -$1,000 | Dealer Negative Front Gross Profit -$2,200 |
| Plaintiff's Commissions -$40 | Plaintiff's Commissions -$88 |

| Manufacturer Statement | Dealer Statement |
|---|---|
| Manufacturer Invoice $50,000 | Manufacturer Invoice $50,000 |
| | Add PACK fee of $800 |
| | Add Doc fee of $400 |
| Customer Cost of Car $50,000 | Customer Cost of Car $51,200 |
| Customer Purchase Price $52,000 | Customer Purchase Price $52,000 |
| Dealer Positive Front Gross Profit $2,000 | Dealer Positive Front Gross Profit $800 |
| Plaintiff's Commissions $80 | Plaintiff's Commissions $32 |

13. In each instance, Plaintiff's commission was reduced by $48 (4% of the total fees).

14. This made his total loss equivalent to 8% of all PACK and Doc fees charged on all new and used vehicle sales while he was the General Sales Manager.

15. The total of these fees are as follows:

| Year | Total PACK Fees Earned by Findlay Automotive | Total Doc Fees Earned by Audi Reno Tahoe |
|---|---|---|
| 2020 | $ 338,150.00 | $ 209,212.50 |
| 2021 | $ 367,650.00 | $ 229,137.50 |
| 2022 | $ 322,750.00 | $ 201,242.50 |
| 2023 | $ 393,250.00 | $ 240,295.50 |
| Jan-24 | $ 35,150.00 | $ 21,120.50 |
| Totals | $ 1,456,950.00 | $ 901,008.50 |

### *Work Performance Required Compensation*

16.   Plaintiff's compensation policy stated he would earn a share of the manufacturer bonuses applicable to the sales of new and used vehicles.  In November 2023, Audi of America implemented a new retail sales bonus program for the sales department, as demonstrated in the facts.  The sales department met the objective and earned $39,200 in Margin Bonus Income. This manufacturer bonus was reported as "Other Income" for the dealership on the November 2023 Dealer's financial statement; therefore, no compensation was paid to Plaintiff for his share of the manufacturer bonuses earned by his work performance.

17.   At a managers meeting on February 6, 2024, Ms. Anderson stated, "The financial statements are done. We had $60,000 in extra Audi money, and if it weren't for that, we would have lost money."  On the January 2024 Dealer's financial statement, this income was reported as "Other Income" for the dealership instead of Margin Bonus Income.

18.   With this repeated practice of reporting manufacturer bonus income as "Other Income" for the dealership and not Margin Bonus Income, Defendant Audi avoided paying Plaintiff 4% of the applicable manufacturer bonused earned by sales as stipulated in his compensation policy.

19.   This has occurred throughout Plaintiff's entire time of employment with Defendant Audi as General Sales Manager, a practice Ms. Anderson referred to as "gray areas."

20.   Plaintiff was deprived of income based on his work performance, and he directly compensated his employer 4% of the PACK and Doc fees charged for the 2,261 vehicle sales transactions that were completed while he was General Sales Manager.  Because of the violation of NRS 608.100, Plaintiff suffered financial, emotional and physical harm.

**Third Claim**

Law Violated: Unlawful to Demand or Receive Fee or Commission as a Condition of Giving or Continuing Employment to Work (NRS 613.120).

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.   Defendant Audi and Defendants Findlays violated NRS 613.120 by working together to create and approve Plaintiff's General Sales Manager compensation policy, which was subjected to unlawful demands for commission as a condition of continuing his employment to work.

2.   NRS 613.120 (1) states that it shall be unlawful for any manager, officer or other employee or any person or corporation, charged and entrusted with the employment of any workers, or with the continuance of workers in employment, to demand or receive, either directly or indirectly, from any worker employed through his or her agency or worked or continued in employment under his or her direction or control, any fee, commission or gratuity of any kind or nature as the price or condition of the employment of such worker, or as the price or condition of his or her continuance in such employment.  The purpose of this law in Plaintiff's complaint is to prohibit his employer from placing the risk of lost profits on the employee.  Plaintiff's compensation policy demanded that he compensate Defendant Audi commissions for vehicle sales that resulted in a negative front gross profit.

3.   Plaintiff's General Sales Manager compensation policy was not negotiated nor was it negotiable.  If he did not sign it on January 1, 2020, when he was promoted to General Sales Manager, his employment relationship with Defendant Audi would have ended.  Mr. Parvin stated on several occasions that Plaintiff either agreed to the terms or he would be terminated. As discussed in the First and Second Claims, the terms of Plaintiff's compensation policy included 4% commission of the combined front sales gross as determined by the Manufacturer's financial statement.  Plaintiff was compensated for the aggregate total of new car and used car front gross, and as discussed earlier and demonstrated by the facts, new car and used car front gross can be negative for many sales transactions.  Below are a few examples of why this can occur:

a.   Vehicles need to be sold to earn manufacturer bonuses;

b.   Vehicles need to be sold quickly to meet manufacturer turn rate expectations;

c.   The addition of PACK and Doc fees;

d.   To earn a customer's business;

e.   To compete with larger volume stores in the area who offer lower prices;

f.   Repair costs added to used cars make the total cost of the car unreasonably high;

g.   Vehicles that have not been sold within 60 days must go; and

h.   Trade-in vehicles are not priced correctly.

4.   These are some common examples of why a new or used car may be sold for less than the actual cost of the car and can result in a negative front gross profit.  As demonstrated in the facts, new franchised automobile dealerships expect to take losses on the sales of cars because the earned manufacturer bonuses result in a much greater income per car than the gross

profit and can offset the incurred losses.  Below is Defendant Audi's earned income for both components from new car sales based on Defendant Audi's Dealer's financial statements:

| Year | Average Sales Gross Profit per New Car | Average Bonus Income per New Car |
|---|---|---|
| 2020 | $839.22 | $5,046.53 |
| 2021 | $2,430.36 | $6,118.09 |
| 2022 | $4,295.93 | $6,118.44 |
| 2023 | $2,859.00 | $6,012.68 |
| January 2024 | $2,394.30 | $5,123.52 |

5.  Plaintiff's compensation policy included a bonus for having a greater than negative $300 average monthly gross profit for new car sales demonstrating Defendant Audi's anticipation of selling new cars for a negative gross profit.  Anticipating that new and used car sales can lead to negative gross profits, Sales Consultants are guaranteed to make at least a minimum amount of compensation ($300) per deal.  In fact, Defendant Audi (in the form of Doc fees), Defendant Findlay Automotive (in the form of PACK fees), the Finance Manager (in the form of commissions on "back gross"), the Service Department (in the form of "inspection fees") and Sales Consultants (in the form of "minis") earn compensation on every car sale, regardless of if there is a negative or positive front gross.  But Plaintiff does not.  Not only does he not earn compensation for every sale, but his compensation was calculated so that deals with a negative front gross are deducted from deals that have a positive front gross when using the aggregate method.  In this way, Plaintiff directly compensated Defendant Audi 4% commission of the negative gross profit on deals where customers paid less than the total cost of the new or used car after the addition of the mandatory PACK and Doc fees.  Defendant Audi demanded Plaintiff accept the terms of his compensation policy knowing that he would be directly charged negative front gross commissions against his positive earned commissions.

6.   From January 1, 2023, to January 31, 2024, Defendant Audi sold 153 cars (out of 656 total cars sold) for a negative front gross, and 70 of these negative deals resulted in a negative profit due to the addition of PACK and Doc fees.  The total in negative gross for these 153 cars was $263,486.26.  This led to Plaintiff directly having his positive earned commissions reduced by $10,538.73.  Plaintiff was forced to compensate Defendant Audi 4% commission of the negative gross profit by directly reducing his positive earned commissions as a condition of continuing to work.  Because of the violation of NRS 613.120, Plaintiff suffered financial, emotional and physical harm and is entitled to liquidated damages.

## Fourth Claim

Law Violated: Protected Rights Under the Family Medical Leave Act (FMLA) (29 U.S.C. Code § 2615).

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.   Defendant Audi and Defendant Findlay Automotive reviewed and approved Plaintiff's FMLA leave.  Defendant Audi and Defendants Findlays violated FMLA 29 U.S.C. Code § 2615 by working together to create and approve Plaintiff's new compensation policy effective June 1, 2023, and signed by Plaintiff on June 6, 2023.  The new General Manager Sales compensation policy reduced Plaintiff's salary to $0 and increased bonus objectives, which led to a reduction in his compensation.

2.   Plaintiff exercised his protected right to request family medical leave on May 25, 2023.  Retaliation claims fall under 29 U.S.C. Code § 2615, which states that it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA.  In addition, 29 U.S.C. Code § 2614 (a)(1)(B) states that any eligible employee shall be entitled to on return from such leave to be restored to equivalent pay.

The DOL defines prohibited adverse actions from employers against employees who invoke their protected right to family medical leave.  Reducing an employee's rate of pay is considered by the DOL's Wage and Hour Division to be an adverse action.

3.  Seven days after Plaintiff requested family medical leave, Mr. Parvin created a new compensation policy that was reviewed and approved by Ms. Anderson and Defendants Findlays.  This new compensation policy was to be effective June 1, 2023, and it was presented to Plaintiff on June 6, 2023, by Mr. Parvin.  Mr. Parvin told Plaintiff if he did not sign the new compensation policy, his position with Defendant Audi would be terminated immediately.  Plaintiff signed the agreement under duress.  June 6, 2023, was the day before Plaintiff was going to take an eight week leave from work, the day before his son was having a major knee surgery, two days before he was closing on the purchase of his home, and three days before his daughter was to have a major ankle surgery.  Not only was Plaintiff experiencing significant psychological pressure, but he also believed his job was being threatened.

4.  Section 105 of the FMLA and section 825.220 of the FMLA regulations prohibit employers from using an employee's request for or use of FMLA as a negative factor in employment.  Defendant Audi and Defendants Findlays willfully violated 29 U.S.C. Code § 2615 by reducing Plaintiff's compensation in retaliation to him exercising his protected right and by forcing him to sign a reduced compensation policy while under duress.  Plaintiff was financially, emotionally and physically harmed by the violation of this law and is entitled to liquidation damages.

### Fifth Claim

Law Violated: Nevada Deceptive Trade Practices (NRS 598.0915(15), NRS 598.0923(1)(d), and NRS 598.0923 (1)(e)).

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1. Defendant Audi and Defendants Findlays, in their course of employing Plaintiff as General Sales Manager of Defendant Audi, knowingly and willfully made false representations in Plaintiff's compensation policy, used duress in a transaction, and used an unconscionable practice in two transactions.

2. In the State of Nevada, a person engages in a "deceptive trade practice" if, in the course of his or her business or occupation, he or she knowingly makes any false representation in a transaction (NRS 598.0915(15)). A person also engages in a deceptive trade practice when in the course of his or her business or occupation, he or she knowingly uses coercion, duress or intimidation in a transaction and uses an unconscionable practice in a transaction (NRS 598.0923 (1) §§ d and e). NRS 598.0923 applies to transactions between businesses and consumers (a natural person per NRS 97B.050), aiming to ensure fairness and integrity in commercial dealings. The compensation policy and arbitration agreement between Plaintiff and Defendant Audi are transactions because they are a means of action occurring between two or more persons relating to the conduct of business and commercial affairs (NRS 719.180).

*False Representations*

3. During the course of Plaintiff's employment, several false representations were made by Defendant Audi. As stated in the First Claim, Defendants misclassified Plaintiff as an exempt employee, making this false statement in his compensation policy. As stated in the Second Claim, Defendants stated Plaintiff would earn commissions based on new and used front gross as determined by the "Manufacturer's Financial Statement" at the end of each calendar month. Defendants knew they were not the Manufacturer when they created, reviewed and approved the compensation policy. Also stated in the Second Claim, Defendants knew they would be adding

fees when they created, reviewed and approved the compensation policy, as these fees have been added to all sales transactions since Defendant Audi began operations in January 2012, and they are most likely charged on sales transactions conducted in all of Defendant Findlay Automotive's dealerships.  Defendant Audi omitted the disclosure of PACK and Doc fees being added to the purchase price of every vehicle in Plaintiff's compensation policy.  As stated in the Second and Third Claims, Defendant Audi concealed from Plaintiff that he would be responsible for compensating the dealership a percentage of PACK and Doc fees and a percentage of negative front gross profits.

4.  Defendant Audi's method of calculating Plaintiff's compensation was not directly disclosed in his compensation policy.  Defendant Audi concealed from Plaintiff the true calculation of his commissionable earned income by adding 44 balance sheet page numbers and line numbers to his compensation policy and not furnishing Plaintiff with the monthly balance sheets used to calculate his total earnings.  Defendant Audi provided a "Variable Commission Worksheet," but did not provide Plaintiff with the actual balance sheets used to calculate his earned commissions.  It was not until early 2023, when Plaintiff began to question Defendant Audi's financial practices, was he given permission to access their balance sheets by Defendant Findlay Automotive's financial controller.

***Use of Duress***

5.  According to NRS 598.0923 (1)(d), a person engages in a "deceptive trade practice" when in the course of his or her business or occupation he or she knowingly uses coercion, duress or intimidation in a transaction.  As stated in the Fourth Claim, Mr. Parvin, in the course of his occupation as General Manager of Defendant Audi, knowingly used coercion, duress and intimidation when presenting Plaintiff with his new compensation policy on June 6, 2023, the

day before Plaintiff was starting his eight week approved family medical leave.  The General

Manager was coercive by using the force of his position and the threat of ending Plaintiff's

employment as a means of persuading Plaintiff to sign the new compensation policy.  Plaintiff

experienced psychological duress and was unable to act upon his own free will because if he did

not sign the new compensation policy, he would no longer have his job after his approved family

medical leave ended.  His loss of a job and income had the potential for serious imminent harm

to himself and his family, so he felt he had no choice but to agree to the new terms of his

compensation policy.  Mr. Parvin, on several occasions prior to the Plaintiff's approved medical

leave commencing on June 7, 2023, had made many intimidating statements to the Plaintiff in

person, while at work, and in front of many of the sales staff members, that he could "fire" him

at any time, as demonstrated by the facts.

***Unconscionable Practice***

6.    Per NRS 598.0923 (2)(b), an "unconscionable practice" means an act or practice

which, to the detriment of a consumer (1) takes advantage of the lack of knowledge, ability,

experience or capacity of the consumer to a grossly unfair degree and (2) results in a gross

disparity between the value received and the consideration paid, in a transaction involving a

transfer of consideration.  Black's Law Dictionary defines "unconscionability" as extreme

unfairness, and it is assessed by an objective standard: (1) one party's lack of meaningful choice,

and (2) contractual terms that unreasonably favor the other party.  The three elements of an

unconscionable contract include being one-sided, oppressive and likely to result in unfair

surprise.

7.    The signed arbitration agreement between Plaintiff and Defendant Audi meets the

criteria to be considered unconscionable.  It is extremely unfair to Plaintiff in that he cannot

afford the cost of arbitration due to the financial injuries caused by Defendants.  Plaintiff did not have a choice but was forced to sign the agreement to continue his employment.  The agreement unreasonably favors Defendant Audi in that it protects them from a jury trial for violations they were knowingly and willfully committing at the time it was signed in January 2024.  The Federal Arbitration Act is not intended to protect employers from willful and intentional violations of the laws.  This is not a case of unintentional acts.  It also protects Defendant Audi from a public trial in which the adjudication of this complaint could have relevance to all General Sales Managers employed by Defendant Findlay Automotive.  The arbitration agreement is oppressive in that it unjustly inflicts hardship and constraint upon Plaintiff.  Despite stating that arbitration is beneficial for both parties, the agreement is one-sided.  Plaintiff could be disadvantaged by having to arbitrate his claims due to the complex nature of his case and no judicial precedents. He may not be able to effectively vindicate his statutory causes of action in the arbitral forum. The arbitration agreement is unconscionable in that the terms were unfavorable to Plaintiff and reasonably favorable to Defendants.

8.   The signed compensation policy between Plaintiff and Defendant Audi also meets the criteria to be considered unconscionable.  The fraudulent statements and representations by Defendants caused Plaintiff to enter the compensation agreement without accurately realizing the oppressive nature of its content.  The deceptive practice of using balance sheet page numbers and line numbers to conceal Defendant Audi's packing of unrelated vehicle cost fees to each sale transaction, to conceal Defendant Audi's reduction of Plaintiff's earned commissions for negative front gross deals, and the disparity in bargaining power constitutes unconscionability. Plaintiff lost earned income and Defendants earned income based on Plaintiff's work performance without compensating him accordingly.  This demonstrates the unconscionability of

Plaintiff's compensation policy.  The terms clearly included in the compensation policy by Defendants were an attempt to appropriate from Plaintiff something of substantial economic value and place an unfair and unjustified burden on Plaintiff's substantive economic rights to earn compensation for his work performance.  The substance of the contract was unfavorable toward Plaintiff and reasonably favorable toward Defendant Audi.

9.   It is extremely unfair to Plaintiff in that he was not compensated correctly and forced to compensate Defendant Audi for work he performed that benefited Defendant Audi and Defendants Findlays.  The compensation policy unreasonably favors Defendant Audi and Defendants Findlays by ensuring they earn a profit for every sales transaction and the manufacturer bonuses despite if a sales transaction produces a positive or negative front gross.  The compensation policy is oppressive in that it unjustly inflicts hardship and constraint upon Plaintiff, forcing him to price cars with a negative front gross for Sales Consultants to sell to meet the sales goals established by Audi of America so the dealership can earn incentives.  When deciding upon the price to sell a vehicle, Plaintiff had to choose between making gross profits on the sales of cars or meeting the monthly manufacturer goals.  While making a front gross profit on the sale of a car after the added PACK and Doc fees would benefit Plaintiff, Defendants emphasized the need to sell a certain number of cars in a timely manner as most important because they earned more money per car in manufacturer bonus money and were allotted more new cars to sell.  Therefore, Plaintiff would often sacrifice commissions he could earn by pricing cars so Sales Consultants could quickly sell enough cars for the dealership to meet the manufacturer's goals.

10.   NRS 598.0999 states that the court may require the natural person, firm, or officer or managing agent of the corporation or association to pay to the aggrieved party damages on all

profits derived from the knowing and willful engagement in a deceptive trade practice and treble

damages on all damages suffered by reason of the deceptive trade practice.  Violations of

Nevada's deceptive trade practices laws may result in civil penalties, including monetary

damages, injunctive relief, and attorney's fees.  Consumers have the right to seek remedies for

any harm suffered due to deceptive practices.  Plaintiff alleges that Defendant Audi and

Defendants Findlays made misrepresentations, concealments and omissions about the arbitration

agreement (entered into in January 2024) and the compensation policy (entered into on January

1, 2020) with reckless disregard for the truth.  Plaintiff relied on these misrepresentations to his

detriment and has suffered damages due to them.  Plaintiff was financially, emotionally and

physically harmed by the violations of NRS 598.0915(15), NRS 598.0923(1)(d), and NRS

598.0923 (1)(e).

### Sixth Claim

Law Violated: Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing

(NRS 104.1304).

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.   Defendant Audi and Defendants Findlays, in their course of employing Plaintiff,

worked together and deliberately created two compensation policies for Plaintiff as General

Sales Manager of Defendant Audi in bad faith and absent of fair dealing.

2.   According to NRS 104.1304, every contract or duty within the Uniform Commercial

Code imposes an obligation of good faith in its performance and enforcement and prohibits

arbitrary or unfair actions by one party that work to the disadvantage of the other.  The

obligations of the parties to a compensation policy are primarily covered by the terms of the

contract.  When one party to a contract deliberately countervenes the intention and spirit of a

contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing imposes a burden that requires each party to a contract to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.  Plaintiff's compensation policy was actually breached of the specific terms and obligations of the contract and injured the right of Plaintiff to receive the compensation he earned and was entitled to according to his work performance.

3.   The FLSA exemptions were not created for employers to label any and all employees earning commissions as exempt.  Plaintiff's compensation policy was deliberately designed to unjustly enrich Defendants while working to the disadvantage of Plaintiff.  Defendants were unjustly enriched by earning income from PACK and Doc fees without compensating Plaintiff his share, by misappropriating manufacturer bonuses earned by the sales department to avoid compensating Plaintiff his share, by forcing Plaintiff to directly compensate Defendant Audi commissions on negative gross sales and PACK and Doc fees, by misclassifying Plaintiff as an exempt employee to avoid paying him overtime, and by including factory-to-dealer volume incentives as a part of sales gross profits to give the appearance that Plaintiff was earning more than half of his commissions from the sales of goods and services.  Defendants were unjustly enriched by Plaintiff's work as a commissioned and exempt employee by receiving the benefit of his hours worked without compensating him justly.

4.   Due to Plaintiff's work performance as General Sales Manager, Defendant Audi and Defendants Findlays earned $6,953,232.00 in manufacturer bonuses from Audi of America, $2,357,958.50 in PACK and Doc fees, $94,318.34 from Plaintiff paying 4% commissions on the PACK and Doc fees, approximately $40,000.00 from Plaintiff paying 4% commissions on negative front gross sales transactions, and approximately $99,200.00 in misappropriated

manufacturer bonus income that he is aware of.  Defendants willingly and actually breached Plaintiff's compensation policy and exercised bad faith and unfair dealings, and they received benefits from Plaintiff's labor as General Sales Manager without giving anything of value in return.  Defendants' violation of NRS 104.1304 resulted in financial, emotional and physical harm to Plaintiff.

### Seventh Claim

Law Violated: Liability for Personal Injury (NRS 41.130)

Violated by Defendant Audi, Defendant Findlay Automotive and Defendant Justin.

1.  Defendant Audi and Defendants Findlays committed intentional and gross negligent acts that violated NRS 41.130.  All the acts and/or failures to act alleged herein were duly performed by and/or are attributable to all the Defendants, individually or acting by and through their agents and employees.  Said acts and/or failures to act were within the scope of any agency or employment, or were ratified by the defendants.  Corporate oversight of Defendant Audi was conducted by Defendants Findlays throughout the time frame relevant to this complaint, as demonstrated by the facts.  Defendant Audi's Business Office Manager was employed and supervised by Defendant Findlay Automotive.  Defendants personally participated in the tortious conduct of Defendant Audi by being present and participating in the operations of the company while a violation was being committed that incurred a liability.  Defendant Justin is personally liable for approving, directing, actively participating in, and contributing to the intentional and gross negligent misconduct of Defendant Audi that resulted in fraud, wage theft and a manifest injustice to the Plaintiff.

2.  According to NRS 41.130, whenever a person suffers personal injury by a wrongful act, neglect or default of another, the person causing the injury is liable to the person for

damages; and where the person causing the injury is employed by another person or corporation responsible for the conduct of the person causing the injury, that other person or corporation so responsible is liable to the person injured for damages.  Plaintiff asserts a tort claim of personal injury against all Defendants due to the intentional and gross negligent infliction of physical and emotional distress that caused bodily harm.

3.   According to the Findlay Automotive Group Employee Handbook and the Audi Reno Tahoe Employee Handbook, all employees are expected to accept certain responsibilities, adhere to acceptable business practices, exhibit a high degree of personal integrity, have sincere respect for the rights and feelings of others, and refrain from work behavior that might be harmful to others and/or the dealership.  Defendants had a duty to Plaintiff to provide an honest, safe and healthy workplace.  Defendant Audi and Defendant Findlay Automotive acted in unreasonable ways and failed to act in reasonable ways to ensure Plaintiff was being treated fairly, being compensated fairly, and his workplace was safe and healthy.  Their actions were reckless and indifferent to their responsibilities as employers and owners of the organizations.

4.   Defendant Audi and Defendant Findlay Automotive intentionally pressured Plaintiff to meet manufacturer sales objectives, compensated him with substandard wages according to federal and state laws, created an oppressive compensation policy that forced him to earn reduced compensation from negative gross profits on sales to meet the manufacturer objectives, forced Plaintiff to compensate Defendant Audi for added fees unrelated to the cost of a car, and misappropriated funds.  Defendant Audi and Defendant Findlay Automotive gross negligently violated the manufacturer's policy of mandatory training for sales staff members, treated Plaintiff unfairly in comparison to other managers, failed to respond to two Human Resources Complaints, failed to ensure a drug and alcohol free working environment, and forced him to

resign from his job after 12 years.  As employers and owners of more than 30 automobile dealerships, Defendants Findlays had a duty to act in ways that are not exploiting or endangering their employees.  These intentional and gross negligent acts caused by and allowed by Defendant Audi and Defendants Findlays caused Plaintiff to suffer severe financial harm, emotional harm, and physical harm.

***Intentional Pressure to Meet Audi of America's Sales Objectives***

5.  As demonstrated by the facts, Plaintiff was under constant pressure to meet the manufacturer's sales objectives to earn bonus income and new car inventory for the dealership.  His job was also continuously threatened for failing to comply with the General Manager's demands and Defendants Findlays's expectations for the sales department.  Based on Defendant Audi's balance sheets, the following is a detailed accounting of the total Sales Operating Income, the total Audi of America Margin Bonuses, the total Overall Dealership Net Profit, and a calculation of what the Overall Dealership Net Profit would have been without the margin bonuses from January 2020 to January 2024, demonstrating the trend that manufacturer bonuses were financially more impactful to the dealership's total profit than the gross income earned by new and used car sales:

| Year | Sales Operating Income | Audi of America Margin Bonuses | Overall Dealership Net Profit | Dealership Profit without Manufacturer's Bonuses |
|---|---|---|---|---|
| 2020 | $547,363 | $1,402,934 | $625,026 | $(777,908) |
| 2021 | $596,788 | $1,945,553 | $2,098,276 | $152,723 |
| 2022 | $523,993 | $1,713,162 | $1,546,846 | $(166,316) |
| 2023 | $ 633,546 | $1,773,742 | $1,299,711 | $(474,031) |
| Jan-24 | $56,271 | $117,841 | $35,479 | $(82,362) |

6.  This is important for several reasons.  First, manufacturer bonuses earned Defendant Audi a significantly higher amount of income than the sales gross profit on new and used cars

(reflected in the Sales Operating Income).  Second, without the earning of manufacturer bonuses, Defendant Audi would have had a significantly lower amount of Overall Dealership Profit, even experiencing a negative profit all the years besides 2021 when COVID inflated prices and offered financial assistance to businesses.  Third, Plaintiff's compensation policy included two distinctly different components – a percentage of the sales department's gross profit and a share of the manufacturer bonuses – which put him in a conflicting position for each sale.

7.   Defendants emphasized selling new cars at all costs, even if the gross profit was a loss.  Because of the pressure from Defendants to sell new cars, Plaintiff was forced to take financial losses to meet the manufacturer's sales goals.  An example of how this pressure affected Plaintiff can be demonstrated when Plaintiff returned to work on August 8, 2023, after an eight week approved leave with only three paid weeks and five unpaid weeks.   In his absence, Defendant Audi's new and used car sales and overall dealership net profit decreased (as evident from the Dealer's financial statements).  During the first week of August 2023, Defendant Audi experienced a low number of car sales.  Because of the pressure from a reduced compensation policy, Plaintiff was forced to work an overabundance of hours to earn adequate compensation.  There was the additional pressure of having no income for five weeks and a new mortgage payment.  This led Plaintiff to work the following hours after his unlawful pay reduction:

| Pay Date | Year | Regular Hours Worked | Overtime Hours Worked |
|---|---|---|---|
| 15-Aug | 2023 | 80 | 21.72 |
| 31-Aug | 2023 | 80 | 31.38 |
| 15-Sep | 2023 | 80 | 44.65 |
| 29-Sep | 2023 | 80 | 15.77 |
| 13-Oct | 2023 | 80 | 16.77 |
| 31-Oct | 2023 | 80 | 19.17 |
| 15-Nov | 2023 | 80 | 27.88 |
| 30-Nov | 2023 | 80 | 8.57 |
| 15-Dec | 2023 | 80 | 17.67 |
| 29-Dec | 2023 | 80 | 5.18 |

| 12-Jan | 2024 | 80 | 5 |
| 31-Jan | 2024 | 80 | 28.25 |

8.   Plaintiff had to increase his overtime hours to compensate for the reduced compensation policy and increasing used car front gross losses, and to ensure the manufacturer sales goals were met.  The Sales Health Alliance released a report in 2024 entitled, *State of Mental Health in Sales*, which demonstrated that 68% of Sales Department Managers rated their mental health as fair or poor.  The report cited that the push from dealerships to "do more with less" is having a severe impact on the mental health of everyone in sales, salespeople and managers a like (p.6).  Additionally, this pressure was only on Plaintiff as General Sales Manager.  The Service Manager, Parts Manager, Used Car Sales Manager, Finance Manager and General Manager did not have the pressure to meet manufacturer sales goals or earn bonus money.  As demonstrated by the facts, Defendants pressured Plaintiff to meet Audi of America's expectations and their expectations for positive sales gross profits simultaneously.

***Intentional Substandard Wages***

9.   The FLSA establishes criteria meant to eliminate labor conditions that are detrimental to maintaining a minimum standard of living necessary for health, efficiency, and the general well-being of workers.  The legislation sought to ensure employees a reasonable quality of life outside the workplace and protect them from work conditions that included substandard wages and oppressive hours.  One of the ways the Act accomplishes this is by instituting an overtime pay requirement.  The goals of the FLSA overtime requirement included a shorter work week, compensation for overworked employees, and work spreading (or sharing).  The DOL has referred to the overtime requirements as one of the nation's most important worker protections.

Plaintiff was forced to live with substandard wages due to his exempt misclassification, the unlawful decreases of compensation, and the unlawful decreases of commissions.

    10.  An example of Plaintiff's intentional substandard wages and oppressive hours can be demonstrated by the workdays in January 2024.  Plaintiff worked a total 33.25 unpaid overtime hours, and he earned either $0 or had his compensation reduced for the following days:

| | |
|---|---|
| January 1, 2024 | $0 |
| January 2, 2024 | $0 |
| January 3, 2024 | $0 |
| January 4, 2024 | -$47.94 (fees)<br>-$191.17 (commissions) |
| January 5, 2024 | -$113.82 (fees)<br>-$24.79 (commissions) |
| January 6, 2024 | -$139.82 (fees)<br>-$172.78 (commissions) |
| January 8, 2024 | -$45.95 (fees)<br>-$47.76 (commissions) |
| January 9, 2024 | -$85.88 (fees)<br>-$135.05 (commissions) |
| January 10, 2024 | $0 |
| January 11, 2024 | -$47.94 (fees)<br>-$13.74 (commissions) |
| January 12, 2024 | -$91.88 (fees) |
| January 13, 2024 | -$167.76 (fees)<br>-$57.34 (commissions) |
| January 15, 2024 | -$129.82 (fees) |
| January 16, 2024 | -$123.82 (fees)<br>-$0.46 (commissions) |
| January 17, 2024 | -$75.88 (fees) |
| January 18, 2024 | -$37.94 (fees) |
| January 19, 2024 | -$187.76 (fees)<br>-$267.23 (commissions) |
| January 20, 2024 | -$205.70 (fees) |
| January 22, 2024 | -$37.94 (fees) |
| January 23, 2024 | -$45.94 (fees) |
| January 24, 2024 | -$47.94 (fees)<br>-$110.80 (commissions) |
| January 25, 2024 | -$37.94 (fees)<br>-$23.84 (commissions) |
| January 26, 2024 | -$37.94 (fees)<br>-$47.91 (commissions) |
| January 27, 2024 | $0 |

| January 29, 2024 | -$183.76 (fees) |
| | -$334.40 (commissions) |
| January 30, 2024 | -$181.76 (fees) |
| | -$278.56 (commissions) |
| January 31, 2024 | -$75.88 (fees) |

11.   After working 213.25 total hours in January 2024, including a federal holiday, Plaintiff met the Audi of America sales objectives to earn Defendant Audi $117,841.00 in manufacturer bonuses but had his earned commissions reduced by $3,805.90 from added fees and negative front gross deals.  His compensation was also short by $2,400.00 due to the misappropriated manufacturer bonus money.  January 2024 is reflective of the trend of how many hours Plaintiff worked and how his earned income had been calculated since being promoted to General Sales Manager on January 1, 2020.

12.   Compensating a sales manager on a purely commission based pay plan yet pressuring him to meet sales performance goals to profit the dealership and earn commissions on sales gross profits contradicts the entire spirit of the Fair Labor Standards Act and the exemption requirements established to protect workers, as well as several Nevada labor laws.

### *Intentional Oppressive Compensation Policy*

13.   Due to the conflicting components of Plaintiff's compensation policy, he was subjected to an oppressive situation that unjustly inflicted hardship and constraint.  The compensation policy offered Plaintiff no fair way to benefit from his pay plan.  It was a mental struggle and game every day and every month to figure out how to earn commissions from gross sales and meet manufacturer sales goals to earn bonus money for the dealership.  An example of this can be seen when Plaintiff returned from an eight week family medical leave on August 8, 2023.  In his absence, Audi Reno Tahoe had only sold six new cars during the first week of August, and the manufacturer's sales goal for August 2023 was to sell 29 new cars.  For the

remaining three weeks of August, Plaintiff worked a total of 53.1 overtime hours to achieve the objective. The sales department had to sell 13 of the 29 new cars for a zero or negative front gross profit to reach this objective. Every time a car was sold for a negative front gross profit, Plaintiff knew it was going to cost him money. As stated in the facts, Plaintiff's eligibility for a raise was dependent upon the increased profitability of the sales department, yet the pressure to meet Audi of America's sales goals was emphasized to be more important than the gross profit of sales. Plaintiff did not receive one raise during his role as General Sales Manager because of his inability to increase sales profits, which was directly attributable to the need to meet volume quotas established by Audi of America, as well as the increased front gross losses in used car sales after Defendant Audi employed Mr. Conidaris and gave him control used car sales department on September 1, 2022. Defendant Audi did not earn manufacturer bonus income from the sales of used cars, so used car gross profit can only be earned by selling a used car to a customer for a price higher than the total cost of the used car including the added PACK and Doc fees. As demonstrated in the facts, Mr. Conidaris was not making profitable used car purchasing decisions. Plaintiff demonstrated in his financial presentations to Mr. Parvin, Ms. Anderson and Ms. Fontaine that losses on used cars grew tremendously after Mr. Conidaris became the Used Car Sales Manager. For every unprofitable used car Mr. Conidaris purchased for the sales department to sell, Plaintiff was compensating Defendant Audi 4% commission on the gross losses by having his earned commissions reduced. Plaintiff was oppressed in this situation because Defendant Audi denied him the ability to manage Mr. Conidaris or the used car sales department, but financially punished him for the performance of Mr. Conidaris and the used car sales department.

***Intentional Misappropriation of Funds***

14.   This case demonstrated two known incidents of when the sales department earned a manufacturer bonus that was reported on the Dealer's balance sheet as "Dealership Other Income" to avoid compensating Plaintiff a share.  The facts also demonstrated that another "gray area" on the Dealer's balance sheets have been the deduction of miscellaneous expenses by managers that submit credit card and reimbursement receipts.  Miscellaneous expenses are deducted from the dealership's total profit (which Plaintiff is entitled to 1% of).  Plaintiff questioned Mr. Parvin and Ms. Anderson about the miscellaneous expenses charged to the sales department (as demonstrated in Plaintiff's financial data presentation in September 2023) when he did not have a company credit card or submit receipts for reimbursement.  Despite them both stating they would "go over the numbers" with Plaintiff, neither Mr. Parvin nor Ms. Anderson would respond to Plaintiff's requests for meetings.  The Sales Department's Miscellaneous Expenses and the Dealership's Other Income from January 1, 2020, to January 31, 2024, was:

| Year | Sales Miscellaneous Expenses | Dealership Other Income |
|---|---|---|
| 2020 | $131,226 | $233,324 |
| 2021 | $86,623 | $766,878 |
| 2022 | $86,801 | $115,776 |
| 2023 | $111,474 | $221,071 |
| Jan-24 | $9,390 | $111,841 |

15.   Plaintiff asserts that the Sales Miscellaneous Expense category contains expenses that were not related to the business of the sales department, and the Dealership Other Income category contains income that was earned by the performance of the sales department.  Misappropriating funds in both of these financial categories directly had a negative impact on Plaintiff's earnings.

***Gross Negligent Violation of Audi of America's Mandatory Sales Training Requirement***

16.   Before a salesperson, finance person or sales manager is able to conduct any of the processes involved with purchasing or leasing a new or used Audi and per the franchise agreement, Audi of America has training requirements specific to their policies and procedures of selling the brand.  On many occasions, customers would trade in cars or Audi loaner vehicles would be retired, and this would create a used car inventory.  Audi of America also had a process to certify used Audis before selling the vehicles to consumers.  Prior to September 2022, the General Sales Manager (Plaintiff) and the Sales Manager (Mr. Chris Lowe) were the two people trained and in charge of all new and used car sales.

17.   As demonstrated by the facts, Mr. Conidaris was hired by Defendant Audi to be the Used Car Sales Manager and was designated by Mr. Parvin as an "Other Employee" to avoid Mr. Conidaris having to complete the Audi of America sales training.  Mr. Conidaris never worked for an Audi dealership and had no prior experience with the brand's sales and certification processes for new or used cars.  It is also demonstrated by the facts that Mr. Conidaris was hired to completely control the used car inventory, including purchasing used Audis, pricing Audi trade-ins and certifying used Audis to be sold by Defendant Audi to consumers.  Mr. Conidaris was given complete authority to make these used Audi decisions.  Based on Mr. Conidaris's job description prepared by Mr. Parvin and approved by Ms. Anderson on September 7, 2022, some of his essential duties as Used Car Sales Manager included:

  a.  Helps salespeople close deals;

  b.  Communicates daily with the new vehicle sales manager regarding units need for used vehicle inventory;

  c.  Appraises all incoming used vehicles;

  d.  Maintains vehicle inventory;

e.  Enforces a 60 day turn policy; and

f.  Tracks results of auction purchases and compares gross profits of auction vehicles with those of trade-ins.

18.  Mr. Conidaris was to have a work performance review conducted after 120 days of his employment with Defendant Audi, but his work performance was never evaluated by Mr. Parvin or Ms. Anderson.  On two separate occasions, Plaintiff presented financial data derived from Defendant Audi's financial statements proving that Mr. Conidaris's used car buying decisions were negatively impacting used car front gross profits, the sales department's profit and the dealership's overall profit.  During the March 2023 and September 2023 presentations to Mr. Parvin and Ms. Anderson examining the dealership's financial data since Mr. Conidaris took control of the Used Car Sales Department, Plaintiff shared the following:

a.  March 2023 Presentation:

i.  Used Cars appraised by Mr. Conidaris were earning significantly lower gross profits;

ii.  Average Profit per Used Car decreased from $2,795 to $1,076;

iii.  Used Car Front Gross per unit decreased from $1,485 to $164; and

iv.  The Turn Rate of Used Cars increased from 33 days to 69 days.

b.  September 2023 Presentation:

i.  Used Car Sales Net Profit decreased by 101%;

ii.  Used Car Miscellaneous Expenses increased by 45%;

iii.  4 out of 5 Used Car Sales Expenses increased; and

iv.  Dealership Overall Net Profit decreased by 46%.

19.  At the September 2023 presentation, Plaintiff asked Mr. Parvin and Ms. Anderson:

"How can I be held responsible for the profitability of the sales department when I only have authority and knowledge of the New Car Sales Income and the Finance Income? I have no authority or knowledge of the expenses affecting my department, nor over the Used Car Sales Manager's decisions," and, "If the sales department's expenses are not my concern, and I cannot get any answers to my questions, then how can I increase my department's bottom line?"

20.   As demonstrated by the facts, Mr. Conidaris, Mr. Parvin and Ms. Anderson knew the Used Car Sales Manager was taking losses on used cars and contributing to the decreasing profits of the sales department. Mr. Conidaris's decisions were also directly reducing Plaintiff's income as his compensation policy included used car front gross and his income was directly reduced for negative gross profits from used car sales. Mr. Conidaris's compensation was unaffected by his decisions because he was strictly compensated a $10,000 a month salary.

21.   Defendants are liable for the damages caused by Mr. Conidaris as they were aware of when he was hired, why he was hired, and they worked together to create and approve his compensation policy. Mr. Parvin and Ms. Anderson created and approved his job description. Mr. Parvin knew Mr. Conidaris did not complete the Audi of America sales training yet let him control Audi used cars. Defendants were aware of the financial losses in the used car department based on his work performance. Mr. Conidaris's work performance directly caused Plaintiff to lose income, as well as experience tremendous mental, emotional and physical stress from all the used car losses the dealership was now incurring. The pressure on Plaintiff to increase the profitability of the sales department was even greater after the hiring of Mr. Conidaris. He was not qualified for this position, had no prior Audi experience, and did not complete the Audi training, yet Defendants allowed him to operate as the Used Car Sales Manager and held Plaintiff responsible for the profitability of both new and used cars. From September 1, 2022, until February 10, 2024, Plaintiff experienced increased stress as a result of trying to compensate for his lost income directly related to Mr. Conidaris's control over used car sales.

*Gross Negligent Unfair Manager Treatment*

22.    The two other income earning departments at Audi Reno Tahoe were the service department and the parts department.  Plaintiff was treated unfairly in comparison to the Service Manager, the Parts Manager, and the Used Car Sales Manager.  None of these managers had pressure to meet the manufacturer sales goals.  None of these managers were subjected to reduced or negative commissions.  The Service and Parts Managers were not forced to add unrelated "fees" as costs to their customers that reduced their gross profits.  The Service and Parts Managers earned an 11% commission rate with a guaranteed salary, and the Used Car Sales Manager earned a $10,000 monthly salary.  Plaintiff was denied two promotions and not given a raise during his time as General Sales Manager, and both the Service Manager and Parts Manager were given promotions and raises.  None of the managers worked on Saturdays or holidays, but Plaintiff had to work every Saturday and holiday due to the constant pressure to ensure Sales Consultants were selling cars.  These managers all had a true two day weekend (Saturday and Sunday), but Plaintiff worked for ten years with Sundays and Tuesdays off because Saturday was the busiest day for car sales.

23.    The hours of the service and parts departments were never increased during Plaintiff's time as General Sales Manager, and Mr. Conidaris had an arrangement with Mr. Parvin that allowed him to leave work every day at 5:00 pm and not be subjected to late work hours.  The Service and Parts Managers had company credit cards they used for miscellaneous expenses, and Plaintiff did not.  Plaintiff was subjected to the mandatory Audi of America training and continuing education, and the Used Car Sales Manager was not.  Defendant Audi required a Sales Manager to be present at all times that the sales department was operating, while this was not required of the service or parts departments.  Plaintiff did not receive one "year-end"

bonus, whereas the Service and Parts Managers did.  Plaintiff was the only department manager with no authority over the employees within his department.  Mr. Conidaris never received a disciplinary warning for his poor work performance, insubordination, and failure to comply with company policies, all of which were witnessed by many employees and were proven with data. Mr. Parvin explicitly stated many times, as demonstrated by the facts, that Plaintiff was ultimately responsible for the sales department's profitability, but Mr. Parvin gave him no authority over used cars and sales expenses, while the Service and Parts Managers maintained their authority over their departments, employees and expenses.  The Service and Parts Managers had access to the Dealer's financial statements, while Plaintiff only received this access in 2023 after contacting the Findlay Automotive Financial Controller.  This gross negligent act of treating Plaintiff unfairly in comparison to the other department managers resulted in Plaintiff working longer hours for less compensation and working with disproportionate expectations and demands from Defendants.

### Gross Negligent Failure to Respond to HR Complaints

24.   Defendant Audi and Defendant Findlay Automotive encouraged employees to come forward and make their concerns known to the dealership.  They encouraged employees to pursue discussions of work-related matters until they have been fully resolved.  Although Plaintiff made his concerns known to Defendant Audi, Defendant Findlay Automotive and to Defendant Justin as demonstrated by the facts, Defendants failed to address Plaintiff's concerns regarding the hostile and abusive conduct of Mr. Parvin and Mr. Conidaris.  The lack of response from Defendants and the lack of concern for Mr. Parvin and Mr. Conidaris's reckless conduct caused Plaintiff to endure a hostile work environment almost every day beginning in September 2022.

*Gross Negligent Failure to Ensure a Safe Work Environment*

25.   Defendant Audi and Defendant Findlay Automotive are committed to being a drug-free and alcohol-free workplace.  They are committed to providing a safe working environment to protect their employees and others.  Employees may be required to submit to drug/alcohol screenings when they have had an accident that resulted in injury and/or property damage while on the premises or during working hours.  The violation of this policy may result in discipline, up to and including termination.  Defendants took no disciplinary actions against Mr. Parvin or Mr. Conidaris when both parties had known accidents while at work and on the premises but did not comply with the mandatory drug testing requirements.  Defendant Audi and Defendant Findlay Automotive were both made aware of these accidents as demonstrated by the facts.

26.   Also demonstrated by the facts, Mr. Parvin admitted to having unmanaged physical health issues that could directly affect his mental and cognitive abilities, and cause symptoms such as irritability, anxiety, depression, mood swings, trouble concentrating, trouble making decisions, and more according to the U.S. Centers for Disease Control and Prevention.  Mr. Parvin's health issues were known by Defendants, yet he continued to have unquestioned authority over the dealership's employees and finances.

27.   Plaintiff, as well as several other Defendant Audi employees, did not believe Defendants were taking the necessary steps to ensure a safe work environment.  Both Mr. Parvin and Mr. Conidaris were in safety sensitive positions, yet neither of them were subjected to the drug and alcohol protocol that the other safety sensitive employees were subjected to.

*Gross Negligent Forced Resignation*

28.   One of the main reasons Plaintiff was forced to resign was due to the demand for increased work hours by the newly appointed General Manager of Audi Reno Tahoe (Ms.

Randee Anderson effective January 3, 2024).  Increasing the operating hours of the sales department without hiring any additional Sales Managers or Finance Managers would be forcing Plaintiff to work more hours than he was already working because of the requirement for a manager to be present at all times.  Ms. Anderson stated that her request for longer hours is not up for discussion, and she has the right to increase the working hours of the sales department and possibly include Sundays (which the dealership had never been open on Sundays since it originally opened in January 2012).  Another reason Plaintiff was forced to resign was Ms. Anderson's unwillingness to address his concerns about his compensation policy.  Ms. Anderson shared that Plaintiff's "performance-based" compensation policy was not a top priority for her and until the dealership started to make more money, she did not plan to address his concerns.  Ms. Anderson also demanded that Plaintiff teach her and Mr. Conidaris how to "desk sales deals (determining customer purchases prices for vehicles)," despite neither of them completing the Audi of America sales training.

29.   In January 2024, Ms. Anderson and Mr. Conidaris made the decision to purchase 15 used Audis (sight unseen) from auctions without any discussion with Plaintiff.  As demonstrated by the facts, Ms. Anderson acknowledged that all these cars would most likely have a negative front gross, which would cause Plaintiff to directly lose income upon the sale of these auction cars.  The decreased compensation, oppressive and substandard compensation policy, increased pressure to perform, demand for longer work hours, lack of control over used cars, hostile and unsafe work environment, unfair managerial treatment, lack of support from Human Resources, and Plaintiff's physical and emotional suffering from his work-related stress forced Plaintiff to tender his resignation from his job as General Sales Manager of Audi Reno Tahoe.

***Financial, Emotional and Physical Harm Suffered by Plaintiff***

30.   As demonstrated by the facts and claims, Defendants deprived Plaintiff of proper compensation for his work performance, forced him to work an extreme amount of overtime hours, retaliated against him for exercising his protected rights to submit a Human Resources complaint and request family medical leave, used duress and coercion to force Plaintiff into unconscionable contracts, and committed intentional and gross negligent acts towards Plaintiff. The financial harm suffered by Plaintiff due to Defendants' intentional and gross negligent acts is great.  He is currently three months behind on his mortgage payment and in jeopardy of foreclosing on the house he purchased on June 8, 2023, two days before he was forced to sign his reduced compensation plan.  His credit score is ruined due to his maxed credit cards and inability to make monthly payments.  He has been forced to liquidate whatever assets he had to buy food and pay utilities.  He currently owes several family members large amounts of money.  The emotional harm suffered by Plaintiff due to Defendants' intentional and gross negligent acts, as well as from the financial harm caused by these acts, has been increased stress levels, increased levels of fear and worry, and severe sadness and feelings of hopelessness, which manifested in the physical symptoms of high blood pressure, insomnia, anxiety and depression.

31.   The physical harm suffered by Plaintiff is life altering.  Prior to September 1, 2022, when Defendant Audi hired Mr. Conidaris and decided to shift their focus to used car sales, Plaintiff did not have high blood pressure, insomnia, anxiety or depression.  Based on Plaintiff's medical history, he consistently had normal blood pressure since his first stroke on April 5, 2013, until October 7, 2022, when his blood pressure became elevated into the "high" category.  This was a few hours after a sales meeting had taken place at Audi Reno Tahoe (demonstrated in the facts) and three days before Plaintiff emailed a letter to Defendant Findlay Automotive's Human Resources Director about Mr. Parvin threatening his job and giving Mr. Conidaris complete

control of the used car sales.  His blood pressure that day was 155/90, and he had the following blood pressure readings conducted by his doctor until he resigned:

    a.   March 28, 2023 - blood pressure was 164/116

    b.   October 10, 2023 - blood pressure was 160/100

    c.   November 1, 2023 - blood pressure was 175/113

32.   On many occasions while at work, Plaintiff took his blood pressure, and it was witnessed by several sales staff members.  His blood pressure readings at work were dangerously high (190's/160's), and sales staff members urged Plaintiff to leave work and go to the hospital. Plaintiff was too worried to leave work because of the pressure to meet sales objectives and the fear of losing money on negative front gross used car deals conducted by Mr. Conidaris.  Stress can cause hypertension through repeated blood pressure elevations as well as by stimulation of the nervous system to produce large amounts of vasoconstricting hormones that increase blood pressure.  Plaintiff experienced repeated blood pressure elevations almost every day that he was at work after September 1, 2022.  According to the American Heart Association, high blood pressure (also known as hypertension) can lead to heart attack, stroke, heart failure, kidney disease or failure, vision loss, sexual dysfunction, heart disease and atherosclerosis and is the number one risk factor for having a stroke.  The American Heart Association estimates that one in four people who have a stroke will have another stroke in the future, and that high blood pressure is directly correlated with increased risks of a stroke or heart attack.

33.   Defendant Audi was aware of Plaintiff's first stroke that happened while he was at work on April 5, 2013, as a Sales Consultant, and they committed intentional and gross negligent acts with no regard to how his physical health could be affected.  These malicious acts have caused him to have high blood pressure, which increases his risk of a second stroke by 30%.

Approximately 39% of second strokes are fatal.  Plaintiff now has to take daily blood pressure medications to control his high blood pressure, and the side effects of these medications include headaches, fatigue, cough and dizziness.  Plaintiff's medical history also documents de novo insomnia, anxiety and depression since September 1, 2022.

## DEMAND FOR RELIEF

### *Relief for First Claim*

1.  Due to a change in the payroll company managing Plaintiff's compensation, he was only able to retrieve his paystubs reflecting the total hours worked for January 1, 2022, through January 31, 2024. The total overtime hours worked during this time period are as follows:

| Year | Total Overtime Hours Worked |
|---|---|
| 2022 | 328.19 |
| 2023 | 439.81 |
| Jan-24 | 33.25 |

2.  This leads to an average of 32.05 hours per month.

3.  2021 Prevailing Rate $13.13 per hour X 352.55 hours (based on average hours per month x 11) = $4,628.98.

4.  2022 Prevailing Rate $14.25 per hour X 328.19 hours = $4,676.71.

5.  2023 Prevailing Rate $15.75 per hour X 439.81 = $6,927.01.

6.  January 2024 Prevailing Rate $15.75 per hour = $523.69.

7.  Plaintiff is seeking $16,756.39 in unpaid wages and $16,756.39 in liquidated damages.

8.  Total relief sought for Claim 1 = $33,512.78.

### *Relief for Second Claim*

9.   Per NRS 608.260 (2)(a), an employee is entitled to all remedies available under the law or in equity appropriate to remedy the violation by the employer, which may include, without limitation, back pay and an equal amount as liquidated damages.

10.   Plaintiff is entitled to back pay equivalent to 8% of the total PACK and Docs fees earned from January 1, 2020, to January 31, 2024, due to Defendant Audi charging him 4% commission for the fees instead of compensating him 4% commission for the fees.  Plaintiff is also entitled to back pay equivalent to 4% of the misclassified manufacturer bonus income of $39,200 for November 2023 and $60,000 for January 2024.

11.   PACK fees = $1,456,950.00 x 8% = $116,556.00.

12.   Doc fees = $901,008.50 x 8% = $72,080.68.

13.   Margin Bonus Income = $99,200 x 4% = $3,968.00.

14.   Plaintiff is seeking $192,604.68 in total back pay and $192,604.68 in liquidated damages.

15.   Total relief sought for Claim 2 = $385,209.36.

### Relief for Third Claim

16.   The average amount of monthly negative commissions Plaintiff was forced to directly compensate Defendant Audi can be calculated by dividing $10,538.73 (negative commissions from January 1, 2023, to January 31, 2024) by 13, which equals $810.67 average per month.

17.   Plaintiff worked as the General Sales Manager for 49 months; therefore, he is seeking $39,722.83 in back pay and $39,722.83 in liquidated damages.

18.   The total relief sought for Claim 3 = $79,445.66.

### Relief for Fourth Claim

19.   Plaintiff's reduced compensation policy that was forced in retaliation to his protected right to request family medical leave resulted in the following financial losses from June 1, 2023, to January 31, 2024:

| June 2023 | Loss of $884.00 |
| August 2023 | Loss of $884.00 |
| September 2023 | Loss of $884.00 |
| October 2023 | Loss of $1334.00 |
| November 2023 | Loss of $1334.00 |
| December 2023 | Loss of $1834.00 |
| January 2024 | Loss of $1167.00 |

20.   Plaintiff is seeking $8,321.00 in back pay and $8,321.00 in liquidated damages.

21.   The total relief sought for Claim 4 = $16,642.00.

**Relief for Fifth Claim**

22.   Plaintiff asks for an injunctive relief to stop Defendants from compelling this complaint to arbitration and grant Plaintiff a trial by jury.

23.   For the financial harm suffered due to the deceptive practices, Plaintiff is entitled to treble damages for the unpaid wages and back pay claimed in the First, Second, Third and Fourth Claims of this complaint.

24.   Plaintiff is seeking $1,539,437.40 in treble damages for his total unpaid wages and back pay.

25.   Total relief sought for Claim 5 = $1,539,437.40.

**Relief for Sixth Claim**

26.   When one party performs a contract in a manner that is unfaithful to the purposes of the contract and the justified expectations of the other party are thus denied, damages may be awarded against the party who does not act in good faith.  Unjust enrichment damages can be determined as a fair percentage of Defendants' profit.  For this claim, it is fair to ask for 11%

(the commission rate of the Service Manager and Parts Manager) of the total earned by Defendant Audi from manufacturer bonuses, PACK fees, and Doc fees earned by Plaintiff's work performance as General Sales Manager, and 11% of the negative commissions charged to Plaintiff ($9,351,190.50 X 11%).

27.   The total relief sought from Claim 6 = $1,028,630.96.

**Relief for Seventh Claim**

28.   Under Nevada Law, personal injury claims arising from intentional and gross negligent actions of another are entitled to damages in the form of compensatory damages and punitive damages.  Plaintiff is seeking relief for lost earning capacity, pain and suffering, emotional distress, medical bills and physical impairment based on three times the total relief amount sought for all the claims filed against Defendants.

29.   The total relief sought for Claim 7 = $9,248,634.48.

## TOTAL DEMAND FOR RELIEF

The total relief sought for all claims is $12,331,512.64.

## DEMAND FOR JURY TRIAL

[X] Plaintiff demands a jury trial on all issues.

Respectfully submitted,

Date: 8/19/2024

Sign Name: _Barry James Christensen II_

Print Name: Barry James Christensen II

Address: 1606 Ashbury Lane
Reno, Washoe County, NV 89523

Phone Number: 702 497 6186

Email Address: LVBJC@Mail.com